## In re STANDARD GAS & ELECTRIC CO. (three cases).
### Nos. 8885, 8906, 8934.

Circuit Court of Appeals, Third Circuit.

Argued June 19, 1945.

Decided Sept. 14, 1945.

David K. Kadane, of Philadelphia, Pa., for S. E. C.

A. Louis Flynn, of Chicago, Ill., for Standard Gas & Electric.

Thomas O'G. FitzGibbon, of New York City, for Guaranty Trust Co.

Spencer Pinkham, of New York City, for Union College et al.

Albert J. Fleischmann, of Baltimore, Md., pro se.

Before MILLER,[*] GOODRICH, and McLAUGHLIN, Circuit Judges.

GOODRICH, Circuit Judge.

In the reorganization of Standard Gas Corporation under the Public Utility Holding Company Act[1] a plan which was the resultant of suggestions by the Company's management and further suggestions by the Securities and Exchange Commission was approved, as finally amended, on November 15, 1944. The Commission then brought proceedings pursuant to Section 11 (e)[2] of the Act in the District Court for the District of Delaware to secure approval of the plan.[3] The plan was a reorganization measure, designed as part of an effort to simplify the general corporate structure of Standard Gas. To the extent that it concerns us, it provided for cancellation of the notes and debentures in the ratio of $304.95 in cash plus $690 worth of stocks[4]

[*] Judge, United States Court of Appeals for the District of Columbia, sitting by assignment of the Chief Justice of the United States, pursuant to the provisions of the Act of December 29, 1942, entitled "An Act to amend the Judicial Code to authorize the Chief Justice of the United States to assign circuit judges to temporary duty in circuits other than their own."

[1] Act of Aug. 26, 1935, c. 687, Title I § 33, 49 Stat. 838, 15 U.S.C.A. § 79–79z—6; 15 U.S.C.A. § 79k in particular.

[2] 15 U.S.C.A. § 79k(e).

"In accordance with such rules and regulations or order as the Commission may deem necessary or appropriate in the public interest or for the protection of investors or consumers, any registered holding company or any subsidiary company of a registered holding company may, at any time after January 1, 1936, submit a plan to the Commission for the divestment of control, securities, or other assets, or for the other action by such company or any subsidiary company thereof for the purpose of enabling such company or any subsidiary company thereof to comply with the provisions of subsection (b). If, after notice and opportunity for hearing, the Commission shall find such plan, as submitted or as modified, necessary to effectuate the provisions of subsection (b) and fair and equitable to the persons affected by such plan, the Commission shall make an order approving such plan; and the Commission, at the request of the company, may apply to a court, in accordance with the provisions of subsection (f) of section 79r of this chapter, to enforce and carry out the terms and provisions of such plan. If, upon any such application, the court, after notice and opportunity for hearing, shall approve such plan as fair and equitable and as appropriate to effectuate the provisions of this section, the court as a court of equity may, to such extent as it deems necessary for the purpose of carrying out the terms and provisions of such plan, take exclusive jurisdiction and possession of the company or companies and the assets thereof, wherever located; and the court shall have jurisdiction to appoint a trustee, and the court may constitute and appoint the Commission as sole trustee, to hold or administer, under the direction of the court and in accordance with the plan theretofore approved by the court and the Commission, the assets so possessed."

[3] The plan is fully set out in the findings and opinion of the Commission of Nov. 15, 1944; Holding Company Act Releases Nos. 5430 and 5070.

[4] The stocks distributed were especially selected on the basis of comparative amount and constancy of yield. They represented the cream of the portfolio. Thus while a 30% decline in consolidated gross income would wipe out earnings on debentures it would necessitate a 35% drop to achieve the same result in the distributable stocks. The stocks chosen and the mode of apportionment are as follows:

| Stocks | No. of Shares | Assigned Value Per Share | Aggregate Assigned Value |
|---|---|---|---|
| Pacific Gas and Electric Co. | 3 | $32. | $96. |
| Oklahoma Gas and Electric Co. | 12 | 21. | 252. |
| The California Oregon Power Co. | 5 | 24. | 120. |
| Mountain States Power Co. | 2 | 21. | 42. |
| Wisconsin Public Service Corp. | 18 | 10. | 180. |
| | | | $690.00 |
| Cash Payment | | | $304.95 |
| Cash Differential | | | 5.05 |
| | | Total | $1000.00 |

to be distributed from the Company portfolio plus a market fluctuation differential now fixed at $5.05 (3% maximum) totaling $1,000 for each $1,000 of debt retired. This appeal from the District Court decision [5] by the Company and by the Commission has been met by cross-appeals filed by some of the debenture holders.

The questions in order of difficulty and importance are as follows:

(1) The power of the Commission to order distribution in kind to note and debenture holders instead of ordering a sale of corporation assets and paying them in cash.

(2) If the Commission has such power was it properly exercised in this case? Is this a matter on which a District Court and an Appellate Court should exercise an independent judgment or is its function to be limited to determining whether the Commission's action was reasonable under the circumstances.

(3) Exercisability of the call premium on the debentures to be cancelled.

(4) Problem of valuation of the shares proposed to be distributed.

Power to Order Distribution in Kind

■ The primary question is concerned with the power of the Commission to order distribution in kind rather than cash. Both the Commission and the opposing security holders start with the premise that absent statutory authorization the creditor of a solvent corporation must be paid off in cash. The Commission contends that statutory authority for payment in kind exists. The security holders, of course, disagree, and the District Court is of the same view.

It is clear from the legislative history of the Act that power of reorganization was one of the intended and well recognized means for effectuating the Congressional purpose. On February 6, 1935, a bill was first introduced by Senator Wheeler as S. 1725 in the Senate and by Congressman Rayburn as H. R. 5423, a companion measure in the House. Section 11 of S. 1725 expressly gave the Commission power to order reorganizations, but contained no provision for permitting voluntary plans. A substitute bill, S. 2796, was introduced on May 9, 1935, by the same sponsor. Section 11(e) first appeared in this bill and to meet the standards of Section 11(b) expressly permitted a voluntary plan, "for

the divestment of control, securities, or other assets or for the reorganization or dissolution of such company, or any subsidiary company." In the Act as it finally passed this was changed to, "for the divestment of control, securities, or other assets, or for other action by such company or any subsidiary company."

Appellants argue that the change narrowed the former language. It needs no semanticist to be aware that the words "other action" are broader in meaning than the more connotative and precisely denotative words "reorganization or dissolution". Nor need we determine the matter on such meager grounds. The Senate Report (S.Rep. No. 621, 74th Cong., 1st Sess. on S. 2796, p. 33 (1935)) stated: "Subsection (e) expressly authorizes a holding company subject to the approval of the Commission and the court to work out a plan of reorganization to make unnecessary the issuance of an involuntary order for its reorganization by the Commission, and the Commission and the court are authorized to approve any plan so worked out voluntarily by a holding company as the Commission and the court might order under their compulsory powers. * * *"

And Mr. Rayburn in reporting out the final bill (79 Cong. Rec., Part. 13, pp. 14164, 14165) makes clear the enlargement of the Commission's available remedies, "This differs from the Senate provision in that the Commission is to take such steps as it finds necessary to insure this result, whereas the Senate provision requires reorganization or dissolution." Furthermore, the argument contra is as applicable to dissolutions as it is to reorganizations. What voluntary plan could squeeze through so narrow an interpretation? And what becomes of the many 11(e) plans that have won court approval hitherto either as dissolutions or reorganizations?

It is equally clear that in the grant of power to reorganize was included the incidental power to distribute in kind. Thus the Senate Report (S. Rep. 621, 74th Cong., 1st Sess. pp. 32, 33) referring to S. 2796 stated: "Existing holding companies will be obliged [ (i) to shed inappropriate affiliates, or (ii) to cease being holding companies] or (iii) to distribute their securities and assets equitably among their security holders. Precedents under the Sherman Antitrust Act and under the Hep-

burn Act demonstrate that the necessary corporate adjustments can be made without forced liquidation or the sacrifice of legitimate investment values. * * * "

And again at pp. 16, 17 of the same report: "As has been explained above, the title does not require the dumping or forced liquidation of securities by the giant holding companies. Such disposition as may be necessary can be accomplished by reorganization which will equitably redistribute securities among existing security holders."

We have still to consider whether the power to distribute in kind applies to note and debenture holders as well as shareholders. The authority of Otis & Co. v. Securities and Exchange Commission, 1945, 323 U.S. 624, 65 S.Ct. 483, is acknowledged by all the parties, as it must be. But they draw a distinction between the technical position of a preferred shareholder and that of a debenture holder in an attempt to show the Otis case inapplicable to the problem here. We think the argument rides that distinction too hard and that as applied to the present problem the distinction is one lacking in essential difference. Persons who put money into a corporate enterprise do not, of course, all stand on the same plane in regard to their rights and duties. The bondholder may have a specific lien on the corporate assets. The noteholders have no specific lien but they are entitled to have their money paid back to them before the shareholders divide what is left. Among shareholders, too, there may be distinctions of which preferred and common stock come most ready to the mind but which distinctions increase in number as other types of shares are created. But we do not see that the classifications of these investors in a corporate enterprise necessitates the drawing of lines so completely separated in categories as the security holders would have us draw here. A noteholder, after all, has only a claim to be paid from corporate assets after security holders with specific liens are paid. The preferred shareholder has to wait until the noteholder is paid for his money, but in the meantime he may have a voice in the management of the corporate enterprise. We do not think that the categories are so absolute that a decision saying what preferred shareholders may be forced to take in a reorganization under the Public Utility Holding Company Act is of no value in another case which concerns debenture holders instead of preferred shareholders.

The short answer to this phase of our problem as applied to this case is that the shareholders and debenture holders both come from the same common stock (that is, the shares of the companies in Standard's portfolio) and cannot rise above their heredity. This identity of origin renders caste distinctions of little significance here.[6] Consequently a general grant of power to reorganize which has been held applicable to one group of security holders, as here, by the Otis decision, must be held applicable to the other. If Congress had meant otherwise, the distinction between debenture holder and shareholder could all too easily have been made. The fact that Congress neither drew the line of demarcation nor even discussed it in the hearings or reports indicates how little weight a separatist argument can be given now.

Our conclusion upon this phase of the case is that distribution in kind may lawfully be ordered by the Commission. We think that these proceedings under the statute are a type of reorganization and that the well known and established methods of accomplishing reorganization in a manner fair to all parties may be applied. We find close analogy, though admittedly, not direct support for our position in the Otis decision, and think that the sweep of that decision extends to the present fact situation. The public purpose of the statute and certain constitutional questions involved in it were discussed by this court

[6] Hearings before Senate Committee on Interstate Commerce, 76th Cong., 1st Sess. on S. 1725 p. 614 (Senator Burton K. Wheeler, Chairman; Wendell L. Willkie, President of the Commonwealth & Southern Corporation, New York City).

"The Chairman. As a matter of fact, it is not a bond in the sense that people have always understood bonds.

"Mr. Willkie. That is true.

"The Chairman. It is not a bond in the sense that we have always understood it. It is simply a debt based on common stock.

"Mr. Willkie. Exactly, sir; and I say 1 of 2 things should be done about it. Any purchaser of that kind of security should have every warning that that is what he is buying, or they should be prohibited. As to prohibiting them, I should think you would want to make a study of all forms of corporate enterprise in this country. I think the wise course is to leave with the Commission the power of determination in that regard."

in Commonwealth & Southern Corporation v. Securities and Exchange Commission, 3 Cir., 1943, 134 F.2d 747. What was then said upon these points is reaffirmed here.

#### Commission Distribution in Kind in This Case

The District Judge gave thoughtful consideration to this question and concluded that even if the Commission had power to order distribution in kind to a noteholder, the present was not a proper case for the exercise of the power. The point is not free from difficulty. The language used in the statute with regard to District Court review is much like that found in Chapter 10 of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq., in which the District Court must find the plan fair and equitable.[7] The power and duty of a District Court in this respect is now a well established principle in federal jurisprudence.

This case does not come to the court as the result of agreement between the parties or the action of a special master approving a plan in the common form of reorganization proceeding. It comes following a thorough consideration by the Securities and Exchange Commission which has a very broad grant of power from Congress in the premises.[8]

■ It can be set out as a well established rule of administrative law that the action of an expert administrative body in determining the particular remedial measures demanded in an individual case is not to be overturned by court action unless the administrative body has lost sight of the law.[9] The more technical the subject matter before the administrative tribunal, the more reluctant the court should be, we think, in disagreeing with it on a matter which is a question of judgment. The subject matter of this Act is highly technical. It seems to us that it is unlikely that Congress, in vesting authority to handle reorganizations of great public utility empires under the statute, would give the expert less power than bodies for easier and less complicated pieces of work unquestionably have. In other words, we think the wide grant of power given by Congress to the Commission carries with it the authority to the Commission to fix the form of reorganizations, subject to court control if the Commission departs from the law. We do not think that the District Court or appellate court is to substitute its notion of practical expediency for that of the Commission.

■ In the instant case, the Commission has said that noteholders are to be paid off partly in cash, partly in stocks from the portfolio of Standard. The District Judge concluded that the only plan which is fair and equitable to the notehold-

---

[7] Thus the applicable portion of Chapter 10 of the Bankruptcy Act, 11 U.S.C.A. § 621, reads, "Confirmation by court. The judge shall confirm a plan if satisfied that —* * * (2) the plan is fair and equitable, and feasible; * * *." The comparable language in Section 11(e) of the Public Utility Holding Company Act, 15 U.S.C.A. § 79k(e), set out in full in footnote 2, reads, "* * * shall approve such plan as fair and equitable and as appropriate to effectuate the provisions of section 11."

[8] Section 1(c) of the Act, 15 U.S.C.A. § 79a(c), provides:

"When abuses of the character above enumerated become persistent and widespread the holding company becomes an agency which, unless regulated, is injurious to investors, consumers, and the general public; and it is hereby declared to be the policy of this title, in accordance with which policy all the provisions of this title shall be interpreted, to meet the problems and eliminate the evils as enumerated in this section, connected with public-utility holding companies which are engaged in interstate commerce or in activities which directly affect or burden interstate commerce; and for the purpose of effectuating such policy to compel the simplification of public-utility holding-company systems and the elimination therefrom of properties detrimental to the proper functioning of such systems, and to provide as soon as practicable for the elimination of public-utility holding companies except as otherwise expressly provided in this title."

[9] 1 Federal Administrative Law, Vom Baur, 253 § 260 states: "Where statutory provisions give an administrative agency a discretionary option to apply one of two or more sanctions to the party involved, upon the basis of certain findings of fact, the exercise of such discretion is not subject to judicial review. If the sanction selected by the agency is legally appropriate for the facts found, there is no occasion for judicial review. Private persons have no right to a particular selection of optional administrative sanctions, and the matter of choice is entirely one of administrative discretion."

ers is to pay them in cash the amount of their notes.

Fair and equitable are not terms to be applied in the abstract; they relate to all the parties concerned, shareholders as well as creditors. They also relate to a plan designed to accomplish a public purpose as declared in the statute which is being enforced. Companies which are solvent and not being subjected to regulation do not have to be troubled about plans except those for promoting their own business. But certain public utility holding companies are liable, under the statute, to have things done to them in reshaping their affairs to comply with the statute. All those owning interests in the particular enterprise are necessarily affected by the action taken. The object of the whole process is, of course, to accomplish the public purpose with all round fairness to those whose interests are affected.

The noteholders may sell the shares proposed to be distributed to them if they please. If they do, they will have to bear the expense of the sale. That is really all their objection comes down to, once it is established that the shares they are being given, plus the cash, amount to the face of their notes. The Commission says that distribution in kind is good sense. It avoids the expenses of underwriting and selling the shares and paying out the money and, more important, avoids turning the holdings in these companies on the market with the danger of lowering the price of the shares by putting on the market more than could be absorbed without depressing selling prices. Which method is to be followed is a matter of judgment, and the Commission has exercised its judgment. We think its exercise was not unreasonable nor inequitable and should be allowed to stand. There is talk about the noteholders being compelled to take "wampum" instead of money for part of their holdings. This is good, argumentum ad hominem, but it is not good enough. The stuff these noteholders are being given is the very stuff which makes the corporate promise to pay worth anything. They are getting the cream off the milk in the Standard ice box. Nor does this distribution in kind turn them from investors to specu-

lators. All they ever had was the corporation's promise. This promise was backed by what the corporation owned and what the corporation owned was junior equities in a number of public enterprises. Owning the junior equities is no more speculative than the promise of the corporation whose assets consist of such equities.

### Exercisability of Call Premium

■ All the debenture holders appearing before us insist that if the debentures are to be liquidated the holders are entitled to the call premiums specified in the contract between the company and the holders thereof.[10] Neither the Commission nor the District Court agreed with this view and we do not either. There is good authority supporting the position that retirement of the obligation under these circumstances is not the kind of voluntary calling by the company which brings the terms into operation. New York Trust Co. v. Securities and Exchange Commission, 2 Cir., 1942, 131 F.2d 274, certiorari denied 318 U.S. 786, 63 S.Ct. 981, 87 L.Ed. 1153, rehearing denied 319 U.S. 781, 63 S.Ct. 1155, 87 L.Ed. 1725; City Nat. Bank and Trust Co. v. Securities and Exchange Commission, 7 Cir., 1943, 134 F.2d 65; In re Laclede Gas Light Co., D.C., E.D., Mo. 1944, 57 F.Supp. 997; In re Consolidated Electric and Gas Co., D.C., Del., 1944, 55 F.Supp. 211.

The debenture holders obliquely attack the holdings of these decisions and say in addition that they present a different problem from the one in this case. We think the decisions are right and that the reasons they give are applicable.

### Problem of Valuation

■ Only one appellant attacks the valuations arrived at as a basis for the stock distribution. This was noteholder Albert J. Fleischmann participating in the appeal on his own behalf. The Commission went thoroughly into the questions of valuation and received a large amount of testimony upon the subject. Its conclusions were subjected to examination by the District Court and an express finding of fact was made upholding the values set by the Commission.[11]

---

[10] The language in the debenture is that "at the option of the Company this debenture may be redeemed" etc.

[11] Findings of Fact 11: "$695.05 constitutes a fair value for the Stocks pro-

posed to be delivered to the Noteholders [i.e. note and debenture holders] under the Plan but the values of such stocks are not static and the Stocks, by reason of variation in market value, may be worth much

The subject is one upon which it is especially difficult to demonstrate with any mathematical precision the correctness of the answer reached. Few things have a value which can be expressed in absolute terms if indeed any do. It can nearly always be argued that certain considerations or figures should be given more weight, and others less, than the evaluating body gave them. Yet, to finish up a practical piece of business, a value has to be set and someone must have the eventual responsibility of determining what the figure is to be. We have been over the arguments attacking the figures. While the points are admittedly subject to discussion, we find no basis on which we as an appellate court could overthrow the conclusions reached both by the Commission and the District Court.[12]

The judgment of the District Court is reversed and the case remanded for further proceedings not inconsistent with this opinion.

---

less or much more than $695.05 when received by the Noteholder as contemplated by the Plan."

[12] Actually it was not incumbent upon the Commission to reduce the result to dollars and cents in the process of valuation. All that is required is a "comparison" of the new securities with the old "to determine whether the new are the equitable equivalent of the old." Group of Institutional Investors v. Chicago M. St. P. and P. R. Co., 1942, 318 U.S. 523, 63 S.Ct. 727, 749, 87 L.Ed. 959. Two factors that bulk largest in determining the "equitable equivalent" of what was at least nominally a debenture, though founded on common stocks, are safety and interest rate. As pointed out in footnote 4 the safety factor was increased. The interest rate was increased from a rate of 6% to a projected earnings rate of 10%.