## LAHTI v. NEW ENGLAND POWER ASS'N et al.

### SIMONDS et al. v. SAME.

Nos. 4216, 4217.

Circuit Court of Appeals, First Circuit.

April 11, 1947.

Arthur E. Whittemore, of Boston, Mass. (George J. Devlin and Nutter, McClennen & Fish, of Boston, Mass., on the brief), for appellant Lahti.

James A. Austin, of New York City (Winthrop, Stimson, Putnam & Roberts, of New York City, Arthur M. Allen and Hinckley, Allen, Tillinghast & Wheeler, all of Providence, R. I., on the brief) for appellants Simonds et al.

John R. Quarles of Boston, Mass. (Frederick J. Dunn, Leeds A. Wheeler and Ropes, Gray, Best, Coolidge & Rugg, all of Boston, Mass., on the brief), for appellees New England Power Ass'n et al.

Harry G. Slater, Chief Counsel, Public Utilities Div., of Philadelphia, Pa. (Roger S. Foster, Sol., Sidney H. Willner, Asst. Sol., David Ferber, Sp. Counsel, and Bernard S. Kanton, Atty., all of Philadelphia, Pa., on the brief), for appellee Securities and Exchange Commission.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

MAGRUDER, Circuit Judge.

The Securities and Exchange Commission, having approved a plan submitted by New England Power Association and its subsidiary holding companies for simplification of their holding company system in compliance with the provisions of § 11(b) (2) of the Public Utility Holding Company Act of 1935, 49 Stat. 803, 15 U.S.C.A. § 79 k(b) (2), and with an order of the Commission thereunder, filed in the court below its application pursuant to §§ 11(e), 18(f) and 25 of the Act, 15 U.S.C.A. §§ 79k(e), 79r(f), 79y, for judicial enforcement of the plan. By order entered June 18, 1946, the district court adopted as its own the findings of fact and conclusions of law theretofore filed in the administrative proceeding; approved the plan as fair and equitable, and as appropriate to effectuate the provisions of § 11 of the Act; and directed the consummation of the plan. These appeals were taken by holders of three of the thirteen classes of publicly held securities affected by the plan.

New England Power Association (hereinafter referred to as "NEPA") is a voluntary association organized under the laws of Massachusetts and is a holding company within the meaning of § 2(a) (7) of the Act, 15 U.S.C.A. § 79b(a) (7).[1] The NEPA system is New England's largest electric utility system. Directly, or through its five subholding companies, NEPA controls about fifty operating companies, most of them electric utility or gas utility companies, with the remainder in the non-utility field. The area served by these companies comprises Vermont, New Hampshire, Massachusetts, Rhode Island, and a small section of Connecticut.

NEPA's subholding companies, each of them being itself a holding company within the meaning of § 2(a) (7) of the Act, are the following:

1. Massachusetts Power and Light Associates (hereinafter called "MP&L"), a voluntary association organized under the laws of Massachusetts;

2. North Boston Lighting Properties (hereinafter called "NOBO"), a voluntary association organized under the laws of Massachusetts and a subsidiary of MP&L;

3. The Rhode Island Public Service Company (hereinafter called "RIPS"), a corporation organized under the laws of Rhode Island;

4. Massachusetts Utilities Associates Common Voting Trust (hereinafter called "MUA Trust"), a voluntary association organized under the laws of Massachusetts;

5. Massachusetts Utilities Associates (hereinafter called "MUA"), a voluntary association organized under the laws of Massachusetts and a subsidiary of MUA Trust.

The six holding companies in the NEPA system have outstanding eighteen classes of

---

[1] NEPA itself is a subsidiary of International Hydro-Electric System, a holding company which is now in process of dissolution pursuant to an order of the Commission and which presently controls 51.5% of the voting power in NEPA.

securities with widely differing rights, preferences, limitations, and asset and earnings coverages, held by over fifty thousand security holders. In the insert will be found a chart showing the holding companies and securities involved in the plan.

CHART SHOWING HOLDING COMPANIES AND SECURITIES INVOLVED IN PLAN

In 1940 the Commission instituted a proceeding under § 11(b) (2) of the Act against International Hydro-Electric System, respondent. Subsequently the scope of the proceeding was enlarged by bringing in as additional respondents NEPA and its five subholding companies above mentioned. After extensive public hearings the Commission, on March 17, 1943, filed its findings, opinion and order in the proceeding. It was found that the continued existence of RIPS, MUA Trust, MUA, MP&L, and NOBO, as holding companies in the NEPA holding company system, unduly and unnecessarily complicated the structure, and unfairly and inequitably distributed voting power among security holders of the NEPA holding company system. The order directed that MP&L, NOBO, MUA, and RIPS each be eliminated as a holding company in the NEPA system; that MUA Trust be liquidated and dissolved; and that the companies submit to the Commission a plan or plans to effect prompt compliance with the order. No petition for judicial review having been filed within the time specified in § 24(a) of the Act, 15 U.S.C.A. § 79x(a), the order of March 17, 1943, has become final and no longer subject to judicial review.

In its opinion filed with the order of March 17, 1943, the Commission suggested as one possible method of compliance a plan by which the assets presently owned by NEPA, RIPS, MUA, MP&L, and NOBO, would be combined into a single holding company, the securities of which would be distributed among the security holders of the existing holding companies. The plan worked out by the companies and filed on March 6, 1944, was based upon this suggestion of the Commission and, in its original form, provided that the single reorganized holding company should have a capital structure consisting of $60,000,000 of debt, the proceeds of which would be used to pay off existing debt, an issue of 2,594,423 shares of $2 preferred having a par value of $27.50 per share, and an issue of 5,227,368 common shares without par value.

After a hearing on the original plan, the Commission, on June 1, 1945, issued its Statement of Tentative Conclusions indicating its view that the two classes of senior securities (funded debt and preferred stock) in the aggregate amounts proposed were repugnant to the applicable statutory standards. Further the Commission stated that, with a capital structure consisting solely of debt and common stock, it would be permissible for the reorganized holding company to have approximately $85,000,000 of funded debt if appropriate protective provisions were adopted, including an adequate sinking fund and effective restrictions with respect to dilution of debt coverage. An amended plan along these lines was submitted, and after hearings thereon the Commission approved the same on March 14, 1946.

The plan as finally approved by the Commission and by the district court has the following main features: MUA Trust is to be terminated. A single holding company is to be substituted for NEPA and its other subholding companies. The single holding company will be a Massachusetts voluntary association, to be registered as a holding company under the Act. It will own all the assets of NEPA and its subholding companies subject to all their liabilities. For this purpose the present declaration of trust of NEPA is to be amended to conform to the provisions of the plan, including a change in name to New England Electric System (which we shall hereinafter refer to as "NEES"). The reorganized company is to issue $85,000,000 principal amount of debt securities, the proceeds from which are to be used in part for the discharge of the publicly held funded debt of NEPA and subholding companies, and the balance of which, together with some additional cash from the company's treasury, will be used for cash payments to the public holders of preferred stocks of NOBO, MP&L, MUA and RIPS. Since there was not sufficient available cash to satisfy the claims of the preferred stockholders in full, cash was allocated against the so-called "top quality segment" of the various classes of preferred shares, the remainder of such interests being satisfied with shares in the reorganized company which were estimated to provide reasonably assured equivalent income plus compensation for

loss of any preference position.[2] NEES is to issue 6,695,075 common shares, par value $20 per share. The distribution of the new common shares and cash to the various public shareholders of NEPA and its sub-holding companies is shown in the following table:

ternative methods that one which it deems most appropriate." Nor is the plan legally defective in that it does not undertake to meet the integration requirements of § 11(b)(1). The Commission chose to proceed first under § 11(b)(2), leaving § 11(b) (1) problems for future consideration.

| Presently Outstanding Securities Held by the Public | Cash and Common Shares of NEES to be Issued in Exchange |
|---|---|
| **NOBO** | |
| For each Preferred Share | $36 and 1 Share |
| For each Common Share | 2 Shares |
| **MP&L** | |
| For each $2 Preferred Share | $8 and 1 1/10 Shares |
| For each $2 2nd Preferred Share | 3/100 of a Share |
| For each Common Share | 1/100 of a Share |
| **RIPS** | |
| For each Preferred Share | $16.50 and 1 Share |
| For each Class A Share | 3¾ Shares |
| **MUA** | |
| For each Preferred Share | $16.50 and 1½ Shares |
| For each Common Share | 15/100 of a Share |
| **NEPA** | |
| For each 6% Preferred Share | 5 4/10 Shares |
| For each $2 Dividend Preferred Share | 1 8/10 Shares |
| For each Common Share | 65/100 of a Share |

The Commission was well warranted in finding that the plan "provides an appropriate means of accomplishing many of the steps contemplated under Section 11(b)", and that therefore the plan is "necessary to effectuate the provisions of that Section." We do not understand that this is seriously questioned. The plan approved need not have been the only plan that might have fulfilled the statutory requirements. Referring to ·§ 11(e) of the Act, the court, in Commonwealth & Southern Corporation v. Securities and Exchange Commission, 3 Cir., 1943, 134 F.2d 747, 751, said: "Congress evidently intended to permit the Commission to leave to the company involved the initiative in suggesting from among the available al-

This was within the Commission's discretion. American Power & Light Co. v. Securities and Exchange Commission, 1 Cir., 1944, 141 F.2d 606, 614, affirmed 67 S.Ct. 133. The present plan in no way prejudices subsequent compliance by the system with § 11(b)(1).

Appellants' real challenge ·is to the correctness of the finding by the Commission and the district court that the plan is fair and equitable to the persons affected by it. This finding cannot be upset by us unless it is shown to be without rational basis in fact or to be predicated on a clear-cut error of law. Massachusetts Mutual Life Ins. Co. v. Securities and Exchange Commission, 8 Cir., 1945, 151 F.2d 424, 430. The reorganization of a hold-

[2] In reference to what is meant by top quality segment, NEPA in its brief states: "Quality was measured on the basis of a variety of. elements, but principally on the basis of earnings coverages. * * * The portion of each class of preferred shares (referred to in the Record as the 'top quality segments') to be thus satisfied in cash, is such that the dividend requirements of such portion plus all prior charges are covered by the applicable earnings (consolidated) in the ratio of about 2 to 1."

ing company system of this magnitude presented the Commission with a task of more than ordinary complexity. Eighteen classes of securities, with widely varying characteristics, had to be reduced to a common denominator in order to work out an equitable basis of exchange. It is inherent in the statutory objective of simplification that existing security holders will receive in exchange interests different in form from those they are called upon to surrender. Thus if the allocation is otherwise on an equitable basis, it is no objection to the plan that holders of preferred stocks receive common shares of the reorganized company in exchange. See Otis & Co. v. Securities & Exchange Commission, 1945, 323 U.S. 624, 628, 629, 634, 635, 639, 65 S.Ct. 483, 89 L.Ed. 511; In re Standard Gas & Electric Co., 3 Cir., 1945, 151 F.2d 326, 331, 332. The Commission's approval of the proposed capital structure of the reorganized company was well within the limits of the broad discretion confided to it by the Act. See Ecker v. Western Pacific R. Corporation, 1943, 318 U.S. 448, 474, 63 S.Ct. 692, 87 L.Ed. 892.

█ In determining the "equitable equivalent" of the security being surrendered, the Commission recognized that "appropriate consideration must be given to the entire set of rights and limitations of the security in the business context of the issuer, apart from the impact of Section 11." The Commission further stated in its opinion: "Although, in our analysis of the various allocations proposed in the amended plan, data are presented with respect to the underlying assets applicable to the securities being surrendered and to be received, our conclusions with respect to the fairness of each allocation are based primarily upon an analysis of the earnings prospects of each presently outstanding security as compared with the prospective earnings allocated to the holders of such security if the amended plan is consummated." That a comparison of earnings prospects is the primary factor in determining the fairness of the allocations is well settled. Consolidated Rock Products Co. v. Du Bois, 1941, 312 U.S. 510, 526, 61 S.Ct. 675, 85 L.Ed. 982; Otis & Co. v. Securities & Exchange Commission, 1945, 323 U.S. 624, 632, 65 S.Ct. 483, 89 L.Ed. 511; Group of Institutional Investors v. Chicago, Milwaukee, St. P. & P. R. Co., 1943, 318 U.S. 523, 540, 562, 63 S.Ct. 727, 87 L. Ed. 959. We are here in the realm not of mathematical demonstration, but of forecast, based upon expert analysis and weighting of a complex array of factors, in which the informed judgment of the Commission counts heavily. It could not be otherwise.

Appellant Lahti, in No. 4216, holds or represents 1400 shares of MP&L $2 preferred stock out of 957,453 of such shares held by the public. MP&L $2 preferred has no par value. It has a call price of $50 per share; also a liquidation preference of $50 per share in voluntary or involuntary liquidation. Consolidated assets (per books) applicable to these shares as of December 31, 1944, amounted to $40.27 per share, thus leaving no assets applicable to junior securities. On the basis of underlying net assets, adjusted, per books of MP&L subsidiaries, the asset value of the $2 preferred is $24.17 per share. Its dividend requirements have not been regularly earned or paid, and were in arrears $2.25 per share as of the end of 1944. From January 1, 1939, to January 30, 1945, its market price has ranged from $8 to $27 per share. As the Commission correctly states in its brief, "the $2 preferred stock of MP&L is itself the residual security of that company. Its preferences are important only to the extent that they serve to exclude any basis for a claim on the part of the securities junior to it."

Lahti complains that the allocation to MP&L $2 preferred is unfair and inequitable. For each publicly held share to be surrendered under the plan, $8 in cash and 1 1/10 common shares of NEES, the reorganized company, are to be given in exchange.

█ Objection is made to the proposal to satisfy part of Lahti's claim in cash, on two grounds: (1) Lahti alleges that the receipt of cash is disadvantageous to him with reference to the federal income tax. Parceling out the allocations in a reorganization of this sort is complicated enough at best, without taking into ac-

852

count individual tax consequences which of course would vary greatly among fifty thousand shareholders. The Act does not put this impossible burden upon the Commission in passing upon the fairness of the allocations. (2) He further alleges that the result of paying $8 in cash to each share of MP&L $2 preferred, whereas under the formula above stated (footnote 2) no cash is to be paid to NEPA's preferred shares, would be to give the NEPA shareholders a relatively greater voting strength in the reorganized company, as compared with the MP&L $2 preferred shareholders, than would be the case if no cash payments were to be made to any class of shareholders. This, of course, is true, but the result is not objectionable. The Commission must see to it that voting power is equitably distributed in the situation as it will exist after the reorganization. That has been done here. As the Commission found, under the plan "the voting power will attach to a security which will represent the real interest in the enterprise, namely, the common stock of NEES", carrying equal voting rights, share for share. To the extent that the interests of the shareholders of MP&L $2 preferred are to be satisfied in cash, under a formula which we cannot hold to be inappropriate or inequitable, it would be manifestly unfair to allot to such shareholders naked voting rights which would give them a voting power disproportionate to their continuing interest in the reorganized company.

■ The main point at issue is whether $8 cash and 1 1/10 shares of NEES is within the permissible range of equitable equivalence (for the matter is not one of "mathematical certitude") of each share of MP&L $2 preferred. As above mentioned, the Commission attached primary importance to earnings prospects of MP&L $2 preferred, absent the reorganization, as compared with earnings prospects of the common stock of NEES under the proposed reorganization.

In estimating prospective earnings, the Commission arrived at a figure of $1.85 per share as representing a seven-year adjusted average earnings experience of MP&L $2 preferred. This figure the Commission took as the lower end of the range of expected earnings of this stock, absent the plan. At the upper end of the range, the Commission accepted as persuasive a carefully prepared estimate of postwar earnings submitted by the management, indicating future earnings of MP&L $2 preferred at $1.99 per share. The Commission's forecast of earnings for this stock, absent the plan, was thus expressed within a range of $1.85 to $1.99 per share.

On a comparable basis the Commission forecast the earnings on the common stock of NEES, assuming consummation of the plan, within a range of $1.45 to $1.59 per share, or $1.60 to $1.75 per 1 1/10 shares of NEES to be exchanged for each share of MP&L $2 preferred.

It then became necessary to fix the earnings equivalent of the $8 per share cash payment proposed to be made to the MP&L $2 preferred shareholders. In this connection the management had concluded that, upon consideration of the earnings of the MP&L $2 preferred, its then current dividend rate of approximately $1.25 per share and its then current market price of approximately $22 per share, a 6% return was the appropriate measure of the earnings equivalent of the proposed cash payment. On this basis the $8 cash payment would compensate the MP&L preferred stockholders to the extent of 48 cents per share per annum; so that the $8 cash payment plus 1 1/10 shares of NEES would have an earnings equivalent within a range of $2.08 to $2.23, as compared with estimated MP&L $2 preferred earnings, absent the plan, within a range of $1.85 to $1.99 per share.

Objection is made to this 6% rate used in the above calculation. The Commission expressly stated that it did not "accept the 6% rate used by the applicants as necessarily being the appropriate measure of the earnings attributable to the proposed cash payment to the MP&L $2 preferred stockholders. However, the use of a lower rate does not significantly affect the comparison of earnings and therefore the choice of a precise rate is not material to the conclusion." If a 4% rate were taken, the exchange would still be favorable to the MP&L $2 preferred shareholders. An earnings equivalent of cash and NEES

stock within a range of $1.92 to $2.07 would then be compared with prospective earnings of MP&L $2 preferred, absent the plan, within a range of $1.85 to $1.99. On this basis of comparison it cannot be said that the Commission failed to allow the MP&L $2 preferred its fair share of the savings to be effected by the reorganization.

Lahti challenges the foregoing earnings comparison on the ground that the Commission, in estimating prospective earnings of NEES, did not give due weight to a reserve relating to investments which NEES is to set up under the plan to offset the excess of carrying value of its investments over the underlying value of the related assets on the books of the subsidiaries. This reserve will be provided for at the rate of $1,250,000 annually, beginning in the sixth year and ending in the thirtieth year after the plan becomes effective. Its effect will be to withdraw that amount annually from current earnings out of which dividends might lawfully be paid. The objection therefore is really directed to a dividends comparison rather than to the foregoing earnings comparison, for earnings withheld from stockholders and plowed back into the enterprise add value to the security. As a matter of fact, we believe the Commission is right in pointing out that the existence of this reserve will probably not diminish the amount of dividends which otherwise would be paid on the NEES stock, because, even in the absence of such reserve, cash in an amount in excess of $1,250,000 per year will have to be applied to a proposed sinking fund for progressive retirement of the funded debt.

The Commission did make a dividends comparison, in addition to the earnings comparison, since it undertook a complete survey of all factors of possible relevance bearing on the fairness of the allocations. Prospective dividends under the plan were compared with prospective dividends apart from the plan. The conclusion reached was that the dividend position of the MP&L $2 preferred shareholders would be improved under the plan. Lahti objects that the Commission was overoptimistic in estimating the probable future dividends on the NEES common stock, but we cannot say that the Commission's informed judg-

ment on this matter was lacking in rational support. Lahti also urged that the Commission erred in underestimating the prospective dividends on MP&L $2 preferred, absent the plan; the controversy here turning for the most part on whether the Commission was right in concluding that, apart from a reorganization under § 11, MP&L would not, or would not be allowed to, maintain an unsound dividend policy which it had followed in the past. Here again, we cannot find that the Commission's judgment was lacking in rational support. We treat the arguments with relation to the dividends comparison in this summary way because of the relative unimportance of that comparison for the matter in hand. If the fairness of the allocations were made to turn primarily upon a dividends comparison, the result would be unduly to penalize a company which has followed a conservative policy of using part of current earnings to pay off debts and build up assets as contrasted with a company which has preferred to distribute as dividends practically all earnings, even to the extent of having to borrow, or to sell capital assets, to meet sinking fund payments.

For a similar reason we do not discuss in detail arguments based upon an asset comparison which the Commission also made. In its opinion the Commission recognized that the cash and common shares of NEES to be exchanged for the MP&L $2 preferred will represent less assets, on the basis of the adjusted pro forma book figures of NEES, than the assets now represented by the MP&L $2 preferred as they appear on the books of MP&L. For reasons which we regard as persuasive, the Commission did not regard this asset comparison as of controlling significance. The asset discrepancy was not a wide one, and the Commission did not commit any error of law in giving primary weight to the earnings comparison.

As holder of 617 shares of NOBO $3 preferred stock, Lahti also objects to the allocation accorded these shares under the plan.

This company was organized in 1911 as a Massachusetts business trust. MP&L owns 82.5% of its preferred stock and 99.3% of its common. It may be liquidated

at any time by a two-thirds vote of all shares, preferred and common, voting as a single class. Otherwise it will terminate automatically twenty-one years after the death of the last survivor of the original board of trustees. NOBO is a holding company shell, with no substantial organizational identity and performing no managerial or administrative functions. The operating subsidiaries of NOBO are in effect run as departments of NEPA.

NOBO $3 preferred shares have a par value of $50, are non-callable, have a liquidating preference of $50 per share plus accrued dividends, and have equal voting rights with the common shares. Adjusted assets applicable to the preferred stock are well in excess of the $50 preference in liquidation. NOBO's past and prospective earnings are substantially in excess of the preferred dividend requirements, and dividends have been regularly paid. The market value of NOBO preferred from January 1, 1939, to June 30, 1945, has stayed close to $50 most of the time, with a low of $40 and a high of $52.50.

It is proposed in the plan to allot to each share of NOBO preferred $36 in cash and one share of NEES common. The controversy as to the fairness of this allocation involves principally a consideration of the effect of the $50 liquidation preference and a determination whether it is likely that, apart from § 11 of the Act, the controlling interests in NOBO (MP&L, and, ultimately, NEPA) would have brought about NOBO's termination, as they had more than enough votes to do under the power given in the declaration of trust.

In its discussion of the situation of NOBO preferred, the Commission had this to say:

"Absent the impact of Section 11 of the Holding Company Act and assuming for the moment no likelihood of dissolution which would bring into play the $50 per share liquidating preference, the right to receive $3.00 per share per year in perpetuity would produce a value for such preferred stock well in excess of its liquidating preference. On this assumption, an appropriate capitalization rate for the $3.00 in dividends might well be in the neighborhood of 4%, in view of the high coverage with respect to such dividends. On this basis,

i. e., giving no weight to the liquidating price, the stock would have a value of approximately $75 per share."

On the basis of these assumptions, the Commission expressed the view that the proposed allocation of $36 cash plus one share of NEES to each share of NOBO preferred would not be a full equitable equivalent.

But it is obvious that the statement just quoted does not amount to a finding by the Commission that NOBO preferred had a value of $75 per share. The statement was a purely hypothetical one. In the first place, the holders of NOBO preferred do not have "the right to receive $3.00 per share per year in perpetuity". The trust in any event is to terminate twenty-one years after the death of the last survivor of the original board of trustees created in 1911. In the second place, the Commission went on to make the further finding that, in view of all the relevant facts in the record, "the likelihood of liquidation is such that the liquidating preference of the NOBO preferred stock must be given considerable weight in evaluating the preferred stockholders' claim." This is a finding of fact on a matter peculiarly within the Commission's competence, and we cannot say that such finding lacks a rational basis of support in the record. There was evidence that the elimination of this useless holding company would result in a saving of approximately $163,000 annually by the NEPA system, the larger part consisting of savings in corpo-controlling interests were alive to the desirability of eliminating NOBO on this account. In fact some years ago the management submitted to the Commission a plan for the termination of NOBO, but the particular plan was not consummated because the Commission expressed its disapproval of certain of its details. Meanwhile, the matter has remained in abeyance, since the more comprehensive proceeding under § 11 is directed in part to the same end.

Lahti urges that certain practical difficulties would have prevented the liquidation of NOBO by the controlling stockholders under the power given in the declaration of trust. The Commission evidently believed that these difficulties were exaggerated, and certainly not insurmountable; and we can-

not say that the Commission's judgment was clearly wrong on this matter.

▮ Lahti also urges that the Commission's finding of likelihood that NOBO would be liquidated, apart from § 11, ignored a formidable legal obstacle. Lebold v. Inland Steel Co., 7 Cir., 1941, 125 F.2d 369, certiorari denied 1942, 316 U.S. 675, 62 S.Ct. 1045, 86 L.Ed. 1045, is cited in this connection. It may be true that in certain circumstances a court of equity would restrain majority shareholders from exercising a power of dissolution such as is given in NOBO's declaration of trust, where the purpose is to freeze out a minority interest and to continue the business in another guise. The Commission was familiar with this line of cases, as its opinion indicated, but it thought that they were inapplicable to the present situation. We take the same view. As previously indicated, whatever may have been its reason for being in former years, there were ample legitimate grounds for liquidating this hollow and wholly useless corporate entity which now only serves to burden the system with unnecessary corporate expenses and taxes. We know of no principle of equity which would prevent majority stockholders from exercising their contractual powers of dissolution in such circumstances, thus requiring them to keep such a company in existence merely because it may be advantageous to the minority to do so.

▮ The Commission also discussed the fairness of the proposed allocation on another assumption, namely, "that the value of the NOBO preferred stockholders' claim is limited by the liquidation preference of $50 per share". On this assumption, the Commission said, "the allocation of $36 in cash would compensate them for 36/50ths of their total claim, including their claim of dividends, and would leave $0.84 in dividends per year to be compensated for by one share of NEES common stock. Thus, the right to receive $0.84 in dividends would have to be compared with the 7-year average adjusted earnings, and estimated postwar earnings of $1.45 and $1.59, respectively, per new common share of NEES, and estimated dividends of about $1.15 and $1.30 annually per share on the basis of these earnings levels." However, the Commission did not in fact decide that the liquidation preference of $50 per share constituted an absolute ceiling upon the value of the claims of the NOBO preferred stockholders. If it had done so, Lahti might have had a ground of complaint. Cf. Otis & Co. v. Securities and Exchange Commission, 1945, 323 U.S. 624, 65 S.Ct. 483, 89 L.Ed. 511. It merely said that "the likelihood of liquidation" could not be left out of account in evaluating the preferred stockholders' claim. Of course, if the likelihood of liquidation were very great, the value of the NOBO preferred would hardly rise much beyond the $50 liquidating value. It is perhaps more than a coincidence that the market value of the stock has tended to hover around that point during the past several years. The chance of liquidation cannot be expressed in terms of mathematical exactness, but the weight to be given this factor was primarily for the Commission to decide. After weighing this factor in the light of the whole record, the Commission's over-all judgment was "that the allocation of $36 in cash and one share of new common stock accords such stockholders fair and equitable treatment." We think this finding of equitable equivalence must be accepted by us.

Appellants in No. 4217 are a committee representing holders of over half of the shares of RIPS preferred stock.

This corporation was formed under the laws of Rhode Island in 1926, apparently to serve as a pyramiding device in the extension of control by the NEPA system. Like NOBO, it is a little more than a set of books in its parent's office, and it serves no managerial or administrative purpose. Ninety-six per cent of its Class A stock and 100% of its Class B are owned by NEPA. Its preferred stock is almost entirely publicly held.

RIPS preferred has a par value of $27.50. It has a call price and a liquidating preference of $33 per share, plus accrued dividends. It is entitled to preferential dividends of $2 per share. Voting power attaches to the stock only when dividends are in arrears. Since the formation of the company, the preferred dividends have been regularly paid and have been well covered by earnings. The adjusted net assets are

well in excess of the call price and liquidating price of $33 per share. The market value of RIPS preferred from January 1, 1939, through June 30, 1945, varied from $25 to approximately $34 per share, but generally held within a range of $30 to $33 per share.

The RIPS committee objects to the proposed allocation of $16.50 cash plus one share of NEES common for each share of RIPS preferred.

In view of the dividend rate of RIPS preferred, compared with its risk position, it would have been advantageous to RIPS to exercise the call privilege. There was evidence that RIPS could refund the preferred stock, the benefit of which refinancing would accrue to NEPA. The RIPS committee argues that the chance of the preferred stock's being called was remote, because it would have been difficult to devise a plan of refinancing conformable to the standards enforced by the Commission. But the Commission is the best judge of a matter of this sort. It stated:

"We are of the opinion that the call price of $33 per share provides a maximum for the participation of the RIPS $2 preferred stock since NEPA, the holder of the junior equity securities of RIPS, has the legal right to retire the preferred stock at its redemption price apart from the impact of Section 11 of the Act and under present circumstances would in all likelihood call such stock for redemption."

While a "requirement that dollar values be placed on what each security holder surrenders and on what he receives would create an illusion of certainty where none exists and would place an impracticable burden on the whole reorganization process" (Group of Institutional Investors v. Chicago, M., St. P. & P. R. Co., 1943, 318 U.S. 523, 565, 63 S.Ct. 727, 749, 87 L.Ed. 959), nevertheless, where as in this case a definite upper limit may be attributed to the value of the claim to be surrendered, this is an important consideration in assessing the fairness of the proposed exchange. It is true that stocks sometimes sell at a price in excess of the call price, but the spread cannot be wide where there is a strong probability of an early call.

Furthermore if, apart from a § 11 reorganization plan, the shares would have been called earlier than the effective date of the plan, the value of the claim to be satisfied in the reorganization plan cannot be greater than the call price. In such a situation the shareholder indeed receives an incidental benefit from the mere pendency of the plan, for the stock subject to call thereby gets a reprieve, so to speak, and the shareholder enjoys the income therefrom longer than he would have otherwise. So that, even if during the years the plan is pending, the stock happens to sell at a price in excess of the call price, because of the calculation that a stock which is to be eliminated anyway in the proposed reorganization is not likely to be disturbed by a call while the plan is pending, this excess would not have to be compensated for in the exchange. The reason is that, in determining what is an equitable equivalent, consideration must be given to the entire set of rights and limitations of the security to be surrendered, in the business context of the issuer, "apart from the impact of Section 11", as the Commission said in its general discussion. As a matter of fact, the market price of RIPS preferred has held close to the call price during this period, most of the time a little under rather than a little over.

It seems to be conceded that if the plan had provided for a cash payment of $33 per share of RIPS preferred, that would have satisfied the claim in full, including, of course, the right to dividends. Under the particular situation of this stock, the call price of $33 is the measure of the claim, independently of the form in which the equitable equivalent is cast. The Commission put the matter clearly:

"From an earnings standpoint, the $16.50 in cash compensates the RIPS preferred shareholders for half their total claim, including their claim to dividends, which would be equivalent to $1.00 per share per year. On this basis, and assuming 7-year average adjusted earnings of $1.45 and estimated postwar earnings of $1.59 per common share of NEES, the equivalent earnings applicable to each share of RIPS preferred stock would be about $2.45 and $2.59, respectively, per year. Based on the management's estimate of expected dividends, the

RIPS preferred stockholders could expect a return equivalent to $2.15 and $2.30, respectively, as compared with present preferred dividends of $2 per share."

The Commission did not indulge in an "illusion of certainty" by endeavoring to fix an exact figure of $16.50 as the value of one share of NEES common.[3] This is not what it did. It forecast prospective earnings and dividends of NEES common to see whether one share of NEES common would furnish the equitable equivalent of the $1 of dividends on RIPS preferred not compensated for by the cash payment of $16.50.

Various detailed points are urged by the RIPS committee as a basis of challenging the Commission's estimate of prospective earnings and dividends of NEES common. As to this we merely state our conclusion in the language of the Third Circuit in In re Standard Gas & Electric Co., 1945, 151 F.2d 326, 333: "We have been over the arguments attacking the figures. While the points are admittedly subject to discussion, we find no basis on which we as an appellate court could overthrow the conclusions reached both by the Commission and the District Court."

Further, the RIPS committee urges that holders of RIPS preferred have not been compensated adequately for their sacrifice of certain Rhode Island and Massachusetts tax advantages:

 Holders of RIPS preferred, resident in Rhode Island, are by the law of that state exempt from personal property taxes on such shares amounting to four mills per dollar of market value on June 15 of each year. (See General Laws of Rhode Island, 1938, c. 30, § 9, par. Eighth, and § 11.) This tax advantage of course is not derived from the contract provisions attaching to the shares, but from the state's statutory policy with reference to taxing intangible personal property, which policy is subject to change. We do not think that a tax exemption of this sort, accruing not generally to all the holders of RIPS preferred as a class, but only to such holders as happen to be resident in Rhode Island, is a factor that has to be taken into account in making allocations under a § 11 reorganization plan.

Holders of RIPS preferred, resident in Massachusetts, are entitled under a special agreement to a Massachusetts income tax refund (or reimbursement, rather) up to 6% of the dividends received. This, again, is a tax advantage which does not enure to the general benefit of the holders of RIPS preferred as a class, but only to such holders as happen to be resident in Massachusetts. And even as to Massachusetts residents, they do not pay an income tax on such dividends unless the whole amount of their income, from all sources, exceeds $1000. If specific allowance had to be made for this factor, it would introduce a serious complication in devising a plan. A general increase in the allocation, applicable to all the holders of this class of stock, would not solve the difficulty, for that would give a relatively better treatment to non-Massachusetts holders of such shares, as contrasted with Massachusetts holders. If differing allocations had to be made to these two categories of holders of RIPS

---

[3] It may well be that NEES common would be worth $16.50 or more on the basis of capitalizing the prospective applicable earnings. The par value of the stock is to be $20 per share. The asset value per books of NEES applicable to one share of NEES common stock is $21.53. This figure results from carrying the securities of the operating subsidiaries on the books of NEES at amounts deemed to be "fair value", determined primarily by capitalizing the earnings power of such subsidiaries. What market price NEES common would command, if and when issued under the plan, is of course a pretty uncertain thing. An estimate by a witness for the RIPS committee was that NEES common would sell at $14 a share on the market as of July 23, 1945. Apparently, published estimates by other investment experts have forecast a market price ranging from $17 to $25. The proponents of the plan, on the basis of a comparative analysis introduced into the record, made an estimate that the common shares of NEES would sell in the market at a price of at least $20 per share. Of course the validity of the proposed allocations ought not to depend upon the day-to-day fluctuations of market estimates as to what price NEES common would command if and when issued. The Commission made no estimate of this sort, and it did not need to.

858

preferred, other difficulties would be encountered in drafting an acceptable plan, because the individual shareholders would have to be assigned to their respective proper groups as of the date of the consummation of the plan, and shares are changing hands all during the time the plan is pending.

In addition to all this, the tax factor in question is a small detail in the over-all picture; and even if we were convinced that theoretically the factor ought to be taken into account, we would be loath to upset the plan on that point alone, after it has passed the scrutiny of the Commission and of the district court. In a reorganization of this size and complexity, nobody could draft a plan that would measure up to a perfectionist's ideal, and astute minds can always seize upon points of detail upon which a plausible argument can be erected that an ideal equitable equivalent has not been given to this or that security, or that perfect equality of treatment has not been achieved as between the holders of various classes of securities. There necessarily has to be a leeway, a "range of tolerance", within which the Commission's judgment as to the fairness of the allocations is controlling.

We would not have gone into this detail in discussing the argument with reference to the state tax advantage that certain holders of RIPS preferred must surrender in the reorganization, except for the fact that appellant Lahti makes a similar contention as to the provision for reimbursement of Massachusetts income taxes on dividends of MP&L $2 preferred. So far as RIPS preferred is concerned, even if the argument otherwise had some merit, the short answer is that, to the extent that Rhode Island and Massachusetts holders of this security have tax advantages, they would have been extinguished, apart from a reorganization under § 11, by a calling in of the securities at a call price of $33.

 The Commission's ultimate conclusion with reference to RIPS preferred is stated as follows: "In view of all the relevant facts in the record, we are satisfied that the allocation of $16.50 in cash and one share of NEES common stock to the public holders of each share of RIPS preferred stock accords such stockholders fair and

equitable treatment." Upon full consideration, within the limited scope of our review, we have concluded that we must accept the judgment of the Commission and of the district court on this matter.

The order of the District Court is affirmed.