## In re NORTHERN STATES POWER CO. (DELAWARE) et al.
### Civil Action No. 2673.

United States District Court
D. Minnesota, Fourth Division.
Aug. 30, 1948.

Harry G. Slater, Chief Counsel, Myron S. Isaacs, Sp. Counsel, and Robert E. Olson, all of Washington, D. C., for Securities and Exchange Commission.

A. Louis Flynn, of Chicago, Ill., and Cyrus Erickson, of Minneapolis, Minn., for Northern States Power Company (Delaware) and its subsidiaries.

G. Aaron Youngquist, of Fowler, Youngquist, Furber, Taney & Johnson, all of Minneapolis, Minn., for Northern States Power Company (Minnesota).

G. W. Townsend, of Fryberger & Townsend, and Joseph E. Wargo, all of Minneapolis, Minn., for Preferred Stockholders Committee.

Joseph H. Colman and W. F. Marquart, of Dorsey, Colman, Barker, Scott & Barber, all of Minneapolis, Minn., for certain institutional investors.

George B. Leonard, of Leonard, Street & Deinard, and Hyman Edelman and Sidney J. Kaplan, of Kaplan, Edelman & Kaplan, all of Minneapolis, Minn, for Armstrong Preferred Stockholders Committee.

Ralph Wolf, Nathaniel Whitehorn, and Milton Klein, of Hays, Wolf, Schwabacher, Sklar & Epstein, and Charles V. Graham, of Simpson, Thacher & Bartlett, all of New York City, for Lehman Corporation, Lehman Brothers, and Overseas Securities Co., Inc.

John N. Worcester and Robert B. Luick, of Sullivan & Worcester, all of Boston, Mass., for Cameron Biewend, a Class A common stockholder.

B. S. Barron, of Barron, Rice & Rockmore, all of New York City, for certain Class A common stockholders.

Frederic Sammond, of Miller, Mack & Fairchild, of Milwaukee, Wis., for Standard Gas & Electric Company, a Class B common stockholder.

NORDBYE, District Judge.

This proceeding is before the Court upon the application of the Securities and Exchange Commission, pursuant to Section 11 (e) of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79 et seq., to approve a plan of the Northern States Power Company (Delaware), hereinafter referred to as the Delaware Company, as fair and equitable and as appropriate to effectuate the provisions of Section 11(b) of the Act.

The Delaware Company is a registered holding company under the Act and owns all of the common stock of the Northern States Power Company (Minnesota), hereinafter referred to as the Minnesota Company. The Minnesota Company is an operating public utility company furnishing electric and gas service in the States of Minnesota, North Dakota and South Dakota. It has subsidiaries which furnish gas and electric service in the States of Wisconsin, Illinois and Minnesota. This proceeding was instituted on June 3, 1942, when the Delaware Company filed its original plan with the Commission. However, a preliminary step in the process of bringing the Delaware Company into compliance with Section 11 of the Act took place in 1938, when the company was recapitalized and the voting power redistributed among the security holders.

The Commission has found that all parties recognize that the reason for the organization and existence of the Delaware Company no longer obtains. The Commission has concluded that, under Section 11(b) (2) of the Act, the corporate existence of the Delaware Company should be eliminated, and, to accomplish that result, the common stock of the Minnesota Company should be distributed among the stockholders of the Delaware Company. The stock of the Delaware Company is divided into 7% and 6% preferred and Class A and Class B common. The preferred stockholders are entitled to receive annually dividends of $7 and $6 per share before any dividends may be paid to the common. The preferred dividends, if not paid, are cumulative, and must be paid in full before any earnings are paid to the common. Upon liquidation, either involuntary or voluntary, the preferred stockholder is entitled to $100 per share, plus accumulated unpaid dividends, before any assets may be distributed to the common, and there is a call premium of $10 per share on the 7% preferred and $7.50 per share on the 6% preferred. A plan filed by the Delaware Company, as amended in certain respects at the direction of the Commission, to enforce and carry out its liquidation and dissolution has been approved by the Commission as fair and equitable to the parties affected thereby, and it has entered its order approving the plan. That plan is now before this Court for approval.

The capitalization of the Delaware Company may be stated as follows:

7% Cumulative Preferred Stock
391,077 shares outstanding,
par value $100............$39,107,700
6% Cumulative Preferred Stock
391,099 shares outstanding
par value $100.............. 39,109,900
Class A Common Stock
341,551 shares outstanding,
$25 par value............... 8,538,775
Class B Common Stock
729,166⅓ shares outstanding,
without par value.......... 000

The only asset of the Delaware Company outside of current assets is the common stock of the Minnesota Company. Therefore, the primary problem for the Court in this proceeding is to determine whether the proposed allocation of the common stock of the Minnesota Company to the preferred and common stockholders of the Delaware Company amounts to an equitable equivalent of the rights surrendered by these stockholders. There are dividend arrearages amounting to $10.0625 per share on the 7% preferred stock, and $8.625 per share on the 6% preferred stock, aggregating $7,308,441.

The first plan proposed by the Delaware Company, hereinafter referred to as the first amended plan, provided for the payment of $2,540,000 in cash to the 7% and 6% preferred stockholders in reduction of the unpaid arrearages, and the plan re-

classified the Minnesota common stock into 8,216,228 shares and proposed to distribute them as follows:

| | Number of shares of Minnesota re-classified common for each share of Delaware stock | Total number of shares of Minnesota reclassified common allocated to each class of stock of Delaware | Percentage division between classes |
|---|---|---|---|
| 7% Preferred | 10 | 3,910,770 | 47.60 |
| 6% Preferred | 9 | 3,519,891 | 42.84 |
| Total to Preferred | | 7,430,661 | 90.44 |
| Class A Common | 2 | 683,102 | 8.32 |
| Class B Common | 0.1405 | 102,465 | 1.24 |
| Total to Common | | 785,567 | 9.56 |
| | | 8,216,228 | 100.00 |

This plan apparently sought to allocate to the Delaware preferred a sufficient amount of reclassified common stock in Minnesota so as to insure this class of stock a return of $5,084,133, which was the amount of annual dividends which would accrue on the preferred, and, in addition, compensation for their dividend arrearages not paid in cash and due consideration for liquidation preference and for loss of their preferred cumulative position in the assets and earnings of Delaware. The first amended plan was based on a forecast of prospective annual earnings of the Minnesota Company available for the common stock of approximately $6,500,000. There were extended hearings on the first plan before the Commission in the years 1942 and 1943, and in 1944. From on or about June 25, 1942, to on or about June 23, 1944, preferred stockholders were represented in said hearings by the Armstrong Preferred Stockholders Committee, and thereafter said preferred stockholders were represented by the Armstrong Preferred Stockholders Committee and the Preferred Stockholders. Both classes of common stockholders were also represented. In April, 1945, the Commission, subject to some amendments of the plan which were thereafter filed, issued its opinion that the plan should be approved, and in October, 1945, issued its order approving the plan. In approving the first amended plan, the Commission said, in referring to the Delaware common stock, "The allocation to the latter approaches the lower limits of what we consider to be a permissible range of fairness and equity but, in our opinion, it falls within that range."

Thereafter, and on or about January 22, 1946, application was made to this Court for approval and enforcement of the plan. At or about that time, however, certain common stockholders petitioned the Commission to reconsider the plan, contending that recent conditions had rendered it unfair to the common stockholders. Alternate plans were suggested, and after consideration of the objections and a complete hearing afforded to all interested parties, the Commission reopened the hearings on the plan. There were thereafter extended hearings before the Commission in which the common stockholders urged that the Minnesota Company stock earnings were substantially higher than the amounts on which the Commission's findings were predicated in determining the fairness of the allocation. The preferred stockholders were joined by both the Minnesota and Delaware companies in contending before the Commission that the first amended plan was fair and equitable and that there were no changed conditions which impaired its fairness as to both the preferred and common stockholders. However, thereafter, and on or about November 28, 1946, the Commission vacated its order of 1945 approving the plan, and a few days before the Commission issued its order, Delaware filed its second amended plan which

was based upon an estimated annual consolidated earnings of $7,200,000 applicable to the common stock of the Minnesota Company and which provided for an increased allocation of the Minnesota common stock to the Delaware common stockholders. The cash payment of $2,540,000 in reduction of preferred dividend arrearages was retained. The Minnesota common stock was reclassified into 8,922,744 shares. The proposed stock distribution was as follows:

Company. On December 23,1947, the Commission, in its findings and opinion of that date, disapproved the Delaware Company's second amended plan, but stated that it would approve it if certain amendments were made. These amendments were based upon the estimated average consolidated net income of the Minnesota Company applicable to the presently outstanding common stock at a figure of $8,200,000. The Minnesota common stock was reclassified into

| | Number of shares of Minnesota reclassified common for each share of Delaware stock | Total number of shares of Minnesota reclassified common allocated to each class of stock of Delaware | Percentage division between classes |
|---|---|---|---|
| 7% Preferred | 10 | 3,910,770 | 43.83 |
| 6% Preferred | 9 | 3,519,891 | 39.45 |
| Total to Preferred | | 7,430,661 | 83.28 |
| Class A Common | 3.6 | 1,229,583 | 13.78 |
| Class B Common | .36 | 262,500 | 2.94 |
| Total to Common | | 1,492,083 | 16.72 |
| | | 8,922,744 | 100.00 |

Extended hearings were held on the Delaware Company's second amended plan in the month of January, 1947. Objections were heard from both the preferred and common stockholders of the Delaware

9,527,623 shares. Cash payment on preferred arrearages was unchanged. The suggested changes in the allocation of the Minnesota common stock as made by the Commission are as follows:

| | Number of shares of Minnesota reclassified common for each share of Delaware stock | Total number of shares of Minnesota reclassified common allocated to each class of stock of Delaware | Percentage division between classes |
|---|---|---|---|
| 7% Preferred | 10 | 3,910,770 | 41.05 |
| 6% Preferred | 9 | 3,519,891 | 36.94 |
| Total to Preferred | | 7,430,661 | 77.99 |
| Class A Common | 5 1/4 | 1,793,143 | 18.82 |
| Class B Common | 5/12 | 303,819 | 3.19 |
| Total to Common | | 2,096,962 | 22.01 |
| | | 9,527,623 | 100.00 |

On January 7, 1948, the Delaware Company adopted the suggested amendments and filed its application for the approval of the second amended plan, as modified. Thereafter, applications for rehearing were filed by the Armstrong Preferred Stockholders Committee and by certain institutional holders of preferred stock who at or about that time had intervened in the proceedings. These applications and motions were made for leave to present certain additional evidence primarily because certain events had taken place since the closing of the record in January, 1947. The Commission denied the applications and motions by its supplemental findings and opinion and order dated January 30, 1948. All classes of Delaware preferred object to the plan now before the Court. The only common stockholder who has filed objections to the plan is one Cameron Biewend, a holder of Class A common stock. He contends that the allocation of common stock to the Delaware preferred should be less than 70% of the reclassified common. There is no dispute among the preferred stockholders or the Delaware common as to the number of reclassified common shares allocated to them for each share of Delaware stock.

The parties are in substantial agreement that the basic questions for the Court to consider are (1) what is the earning power of the assets to be distributed, and (2) what allocation of the earnings shall be made as between the preferred and common stockholders of the Delaware Company?

The Commission's estimate of average prospective earnings applicable to the present Minnesota stock of $8,200,000 per year is strongly attacked by the preferred stockholders' group as being grossly excessive, without substantial support in the record, and predicated on the failure of the Commission to consider important factors which make it unlikely that the sum represents an average for the next five years, or on a long-range prediction. The preferred stockholders point out that the average annual earnings of the Minnesota Company for the fifteen years prior to 1942 were $6,306,348; that the present earnings of $8,885,000 in 1946 and $8,615,312 in 1947 applicable as dividends for the common stock are the result of the removal of the excess profits tax in 1945 and the inflated earnings which followed the war boom period, and which they assert will not continue. They point out that the common stockholders of Delaware have received no dividends on their stock since 1934, and therefore in reality that stock has been for some time under water; and that the 22% allocation of Minnesota common stock to Delaware common is unwarranted, not only by historical earnings of the Company in the past, but by any sound forecast of earnings for the foreseeable future.

In making its findings that "the average prospective consolidated net income of the Minnesota Company applicable to its presently outstanding shares of common stock may be estimated at $8,200,000 per year," the Commission had before it the record of extensive hearings which had been held during a period exceeding some five years. The Delaware Company's second amended plan, before it was modified at the suggestion of the Commission, whereby the preferred stockholders were allocated 83.28% of the Company's holdings of the reclassified Minnesota Company's common stock and whereby 16.72% was allocated to the common stockholders, was based upon an estimated annual consolidated net income of $7,200,000. It would appear that the allocation to the preferred stockholders under this plan was arrived at as follows: (1) $5,084,133, the amount of their present annual dividends; (2) $610,096.97, representing a return of 3% per annum from the date of accrual to December 31, 1946, on preferred dividend arrearages not paid in cash under the plan; and (3) $301,-154.21, representing 20% of the remainder of the earnings as compensation for loss of the preference position in that the preferred must, under the plan, accept common stock.

On this basis of assumed annual earnings of $7,200,000, with 83.28% to the preferred and 16.72% to the common, the preferred stockholders would be allocated some $5,995,000 and the Delaware common some $1,205,000 of the earnings available for dividends. In its consideration of the Delaware Company's second amended plan before it was modified, the Commission requested the Company to make an estimate

of consolidated net income of the Minnesota Company and its subsidiaries for a five-year period. In response, the Company submitted its estimate for the year 1947, but in submitting an estimate for the years 1948 to 1951 the Company submitted a statement of "assumed" consolidated income for those years predicated upon the assumption that certain conditions would exist during the years referred to. The conditions were:

"(1) a continuation of the 6% average annual rate of increase in kilowatt hour output in the 20-year period from 1926 to 1945, both inclusive, which it allocated to classifications of service according to trends of percentage increases shown in previous years, resulting in an assumed average increase in operating revenues of approximately 4.4% per year from electric utility service and, together with assumptions made as to growth in other classes of service, resulting in an assumed average increase of approximately 5½% per year from all utility service; (2) a continuation of present rates, except that allowance was made for a possible rate reduction in 1947 in the small light and power category; (3) a continuation of hydro-electric generation based on average water conditions for the past 15 years; (4) a continuation of the levels of taxes and unit costs of fuel, labor and materials used in the 1947 estimate; and (5) the existence of market and economic conditions at the time of financing additional capital requirements which will not be inconsistent with the future cost of money assumed by the company."

The estimate of annual earnings available for dividends to the common stockholders for 1947 made by the Company was $7,190,000, and upon the assumptions above indicated, the figures of net earnings submitted by the Company for the years 1948 to 1951, inclusive, were: $7,467,000, $7,757,000, $8,320,000 and $8,820,000 respectively. At or about the time the amended plan providing for the 83.28% and 16.72% allocation was under consideration, the Stone & Webster Service Corporation, referred to herein as Stone & Webster, was hired by certain Delaware common stockholders to make a field study of the properties of the Minnesota Company and an analysis upon which a five-year estimate could be made by it of consolidated net income. This study was made and the report of this company is a part of the record herein. The figures of consolidated net income applicable to Minnesota common stock submitted by that company for the years 1947 to 1951, inclusive, were $8,011,000, $8,200,000, $8,731,000, $9,373,000, and $10,225,000 respectively. The average earning capability of the Company for these years was placed at $8,700,000 per year.

In analyzing the Delaware Company's second amended plan, the Commission refused to approve the Company's method of computing compensation for the dividend arrearages on the preferred stock; that is, the allocation of $610,096 annually representing a 3% per annum return to December 31, 1946, on the unpaid dividend arrearages not paid in cash, and, by that plan, made available to the preferred stockholders for an unlimited period, was deemed by the Commission to be "highly excessive." But it concluded that the right of the preferred to receive $5,084,133 of common stock earnings, before any dividends were paid on the common stock, plus $301,154 as compensation for loss of preferred position, did not adequately compensate the preferred stockholders for preference in quality between the stock which they were surrendering and that which they would receive. This conclusion was indicated, although the Commission was of the opinion that "while the preferred stock of the Delaware Company represents a preferred interest in the common stock of the Minnesota Company, its quality is not greatly superior to that of the common stock of the Minnesota Company on which it is based." The Commission recognized that consideration and appropriate weight should be given to the liquidation preference of the preferred stock "in view of the non-functional nature of the Delaware Company and the possibility of its liquidation even apart from the Act." But it concluded that, in addition to the cash payments made to the preferred on dividend arrearages, the preferred stockholders were not entitled to any more than approximately 78% of the Minnesota Company common stock, to which, on the basis of $8,200,000 annual

earnings available for this stock, there would be applicable earnings of approximately $6,400,000 as compensation to the preferred for all "their existing rights including compensation for dividend arrearages remaining after the cash payment proposed in the plan." And the Commission pointed out that, if 80 to 85% of such earnings were paid as dividends on the common stock thus allocated to the preferred, they would receive from $5,120,000 to $5,440,000 per year in dividend income.

As heretofore indicated, the preferred stockholders characterized the Commission's estimate of $8,200,000 of annual earnings available for the common stock as an attempt to reorganize the Company on war-peak inflated earnings, rather than on a sound analysis of its future earning prospects. It is strongly urged that, under the Commission's plan, the preferred stockholders will not receive the equitable equivalent of that which they are required to surrender and that the Commission did not give due consideration to the effect of numerous factors which demonstrate the fallacy of its forecast. It seems fair to conclude, however, that, if the Commission's estimate of $8,200,000 of annual earnings available for the presently outstanding common stock can be reasonably sustained under the evidence, it should be recognized that the preferred stockholders will receive a fair and equitable equivalent of the bundle of rights which they will be required to surrender in this reorganization proceeding. It is not claimed that the Commission has made any error of law or that it has acted arbitrarily or capriciously in arriving at its conclusions. The controversial question presented is a factual issue, and that is, whether or not under the record there is a rational basis for the Commission's estimate of the future earnings for the presently outstanding common stock of the Minnesota Company.

At the outset, it would seem to be desirable to determine the Court's duty in a proceeding of this nature. Certainly, the Court has the affirmative and independent duty to determine whether the proposed plan is fair and equitable, and if, on the record before me, I find that the plan does not meet these standards, it should be re-ferred back to the Commission. Moreover, if such changes have occurred since the closing of the testimony before the Commission which are so material that it should consider them, I have no doubt that the Court should remand the proceeding to the Commission so that it may consider the events occurring subsequent to its decision. It is not suggested that the parties have not been accorded a full and fair opportunity by the Commission to present their respective positions in the long and extended hearings which have been held in these proceedings. The painstaking and exhaustive manner in which the Commission has considered the many complex and intricate questions arising during the hearings which have now extended over a five-year period, amply establishes that due process has been accorded all the parties. It is suggested, however, that in the exercise of the Court's independent and affirmative duty to determine whether the proposed plan is fair and equitable, the Court should reject the Commission's valuations and estimates and forecasts if such conclusions do not fully and completely square with the Court's appraisal of the testimony in this regard, regardless of the fact that there may be substantial evidence in support of the Commission's findings. Moreover, it is earnestly urged that the Court in this proceeding has the full power of any court in an equity reorganization, and that the findings of fact of the Commission supported by substantial evidence are not binding upon the Court, although such findings should be treated with respect. There is support for this view of the Court's wide latitude of review in Section 11(e) proceedings as announced by the Circuit Court of Appeals of the Third Circuit in Re Engineers Public Service Co., 168 F.2d 722, 736, wherein the court rejected the Commission's contention that "unless the conclusions of the Commission lack rational or statutory foundation they may not be disturbed by the Section 11(e) court." But Judge Biggs' decision in that case must be considered by this Court in light of the particular facts and circumstances therein involved, and by his recognition that Lahti v. New England Power Association, 1 Cir., 160 F.2d 845, and Massachusetts Mutual

Life Ins. Co. v. Securities and Exchange Comm., 8 Cir., 151 F.2d 424, in affirming In re Laclede Gas Light Co., D.C.E.D.Mo., 57 F.Supp. 997, "look the other way." Presumably, Judge Biggs had reference to Judge Thomas' statement in the Massachusetts Mutual Life Ins. Co. case, 151 F.2d at page 430:

"Since there is a 'rational basis' in fact for the finding of the Commission and no 'clear-cut' error of law by either Commission or court, we are not inclined to disturb the conclusion that retirement of the bonds at principal and accrued interest amounts to the 'equitable equivalent of the rights surrendered.' "

And further, 151 F.2d at page 430:

"Obviously, whether, upon retirement of outstanding bonds in the reorganization of an operating utility subsidiary, payment of principal, accrued interest, and redemption premiums is the equitable equivalent of the bondholders' rights depends upon the facts of each particular case. The proper measure of such equivalence is for the determination of the Commission in the first instance, and its expert skill in appraising the facts to be considered must be accorded due weight by the court."

In passing, it may be noted that, in the foregoing case, the appellant urged in its brief before the Circuit Court of Appeals that:

"Section 11(e) of the Public Utility Holding Company Act of 1935 requires the District Court to independently determine whether the plan is fair and equitable and appropriate to effectuate the provisions of Section 11 of the Act. The Court cannot, as it has done here, abdicate this independent duty to the Securities and Exchange Commission."

And further:

"The Court below failed to exercise the independent judgment required of it by the Act. Instead it completely accepted, and felt itself bound by, the conclusions of the Commission, which at best are advisory only."

The weight, therefore, that the Court should attach to the Commission's factual findings was directly before the Circuit Court in that case, and it seems clear that the view of the Eighth Circuit is that such findings should be given considerable weight where there is a rational basis therefor, particularly where it appears that the Commission has given its careful and conscientious consideration to the many complex and involved questions presented by the record. I recognize that I should not blandly accept the Commission's findings. It is my duty to exercise my own independent and informed judgment in determining whether I should approve the plan as fair and equitable. On the other hand, unless I am reasonably clear that the Commission has erred in its factual findings, I should be hesitant to send the plan back to it for further consideration. It has had this reorganization before it for some five years. The questions involved are most difficult and complex because they deal primarily with forecasts for the future, and the appraisal of the innumerable uncertainties and contingent events in the years to come are bound to give rise to difference of opinion. The Commission is the only tribunal which can finally approve a plan of reorganization under the Act. The Court is not vested with any authority to propose a plan, or even make suggestions as to any allocation herein as between the preferred and common stockholders which will be binding upon the Commission. The limited authority vested in the Court, which has either to approve or disapprove the plan, would seem to lend weight to the soundness of the views of the Eighth Circuit as to the duty of a Section 11(e) court where there is a "rational basis" for the Commission's findings. This Court does not have access to the many facilities which the Commission is afforded through its public utility analysts, accountants, engineers, attorneys, etc., whose experience and training in this particular field should signally equip them to aid the Commission in analyzing and appraising the factual considerations which are controlling herein. Moreover, as the court stated in Lahti v. New England Power Association, 1 Cir., 160 F.2d 845, 858:

" * * * In a reorganization of this size and complexity, nobody could draft a plan that would measure up to a perfectionist's ideal, and astute minds can always

seize upon points of detail upon which a plausible argument can be erected that an ideal equitable equivalent has not been given to this or that security, or that perfect equality of treatment has not been achieved as between the holders of various classes of securities. There necessarily has to be a leeway, a 'range of tolerance', within which the Commission's judgment as to the fairness of the allocations is controlling."

█ I conclude, therefore, that the exercise of my independent judgment in passing upon the fairness of the plan to the parties involved must be made in recognition of the experience, skill and facilities of the Commission in considering and appraising the facts before it in the lengthy hearings and voluminous testimony during the past five years. Due weight should be accorded its findings and conclusions in factual matters where there is substantial evidence in support thereof.

This brings me to a consideration of some of the principal objections lodged by the preferred stockholders against the Commission's findings that the estimated average prospective earnings applicable to the presently outstanding common stock of the Minnesota Company is $8,200,000. Parenthetically, it may be stated that, in arriving at that estimate, the Commission emphasizes that this figure represents an average, and that in some years the earnings may exceed and in some years the earnings may be below that figure. But the preferred stockholders maintain that the Commission made two fundamental errors with respect to its estimate: First, that the Minnesota Company is about to fund its pension system at annual cost of some $998,000 net for a period of at least twenty years and that the Commission failed to give due consideration to the effect of this annual expenditure on the net revenues of the Company, and second, that the Minnesota Company is committed to an expansion program involving an expenditure of some $123,000,000 and the financing thereof will require the issuance of additional common stock. It is contended that the Commission gave insufficient weight to the dilution in the per share common stock earnings which will result from the issuance of this additional common stock.

The expense to the Minnesota Company of the proposed pension plan has been the subject of considerable testimony before the Commission commencing in the year 1946. As yet, no permanent pension plan has been adopted by the Company although certain pension benefits are now given to the employees. The present pension costs are between $130,000 to $140,000 per year. It is now proposed that a permanent plan be adopted, the funding of which will cost, according to the Company's estimate, $1,-700,000 annually, or a net annual cost after present income taxes of about $998,000. In making its estimate of the Company's earnings, Stone & Webster assumed pension costs to be some $229,000 less per year than the Company's estimate. It appears that the Company's estimate was based upon actuarial studies as to the cost of funding a plan under which the benefits to the employees would be substantially the same as under the present tentative plan. Stone & Webster's figures are based upon the experience of comparable companies, but, as the Commission points out in its opinion, the difference between the estimates of the Company and Stone & Webster is largely offset by the fact that Stone & Webster's estimate of future labor costs other than pension expense was higher than the Company's. In its 1947 annual report dated March 20, 1948, the Delaware Company made the following report as to the status of the pension plan:

"Pending the adoption of a funded pension plan, the system companies make payments of retirement allowances to employees at the discretion of the Boards of Directors. Studies of a funded pension plan have been made over the past two years and are practically completed. Action on a funded pension plan may be taken in the near future."

All parties to this proceeding concede that the Commission considered the pension plan as a future expense in arriving at its estimate of earnings. But the position of the preferred stockholders is that, although the Commission contends it was given weight, they argue that "insufficient weight" was given to this prospective expenditure. Obviously, it is difficult from the Commission's opinion to measure the

exact weight given to the future pension costs, although it does appear that it did conclude that, by reason of the possibility of the effect of pension costs on future labor costs, it was not necessary "for present purposes to attempt to estimate the precise amount of the expectable increase in pension costs."

In endeavoring to buttress their position that the estimate of $8,200,000 in annual earnings is excessive, the preferred stockholders assume to take the 1946 consolidated earnings available for the common stock, of approximately $8,885,000 and the 1947 consolidated earnings of approximately $8,615,312, and adjust these figures by giving effect to a pension plan expenditure of some $998,000. While such computation may tend to emphasize the future effect of the expenditure when the plan becomes operative, and it probably is a realistic method of illustrating the impact of such a large annual expenditure, notwithstanding, the 1946 and 1947 earnings must be considered as they are reflected in the Company's annual report, and not in light of an expenditure which has not as yet occurred. In making an estimate of an average of $8,200,000 annual earnings for the next five years, the Commission must have assumed the permanent pension plan to be in existence. To assume otherwise is to ignore the plain import of the Commission's opinion. No sufficient showing is made herein that the Commission did not give due consideration to the effect of pension costs in future years as to their impact on future average earnings. And even though one adjusts the 1946 and 1947 earnings by giving effect to the future pension expenditure, which results in earnings somewhat below the $8,200,000 figure, it does not follow that the Court should reject the Commission's forecast as unsound. There are many other factors which may enhance in future years the long-range earnings of the Company so as to absorb the additional pension expense without materially disturbing the estimate of the Commission. For instance, the Minnesota Company has now installed natural gas in the City of St. Paul, and it is not disputed that the substitution of natural gas for manufactured gas will result in substantial future earnings. The increased

profit which the Company anticipates will be derived from the coming of natural gas into St. Paul may, in the not too distant future, fully equal the additional expenditures occurring by reason of the funding of the pension plan. And in contemplating future items of income which may properly be considered in determining the impact of future pension expense, it seems entirely reasonable to regard the effect of the huge construction program which certainly affords a rational basis for assuming that the future net earnings of the Company will increase rather than decrease. The fact that there has been an increase in the estimate of construction costs from $95,000,000 to $123,000,000 is a favorable factor, in that it reflects greater demand for electric current than was first contemplated.

Furthermore, it may be pointed out that the Minnesota Company is now taking an excessive depreciation of 10% of its operating revenue. This method of computing depreciation is in effect because of the deficient depreciation reserve of the Minnesota Company, but the Commission recognized that, in the future, this annual accrual for depreciation may be reduced. As a result of this method of charging depreciation, there was charged in 1947 $500,000 more by way of depreciation than in 1946. When the depreciation accruals are made at the customary rate of 2.5% of plant and equipment, there is no doubt but that the annual income of the Company available for dividends will be substantially increased. And there is also the item of certain charges against income for unamortized debt discount and expense of some $598,000, of which about $550,000 will be discontinued in 1960. While these items were considered by the Commission in the financing of the contemplated construction program, they are also items which bear upon future net income available for dividends. It is just as reasonable to adjust present income with contemplated earnings as it is to adjust present income with contemplated expense. In fact, the readjustment of accounts which reflect charges which will be eliminated by the passage of time and which will thereby be a source of cash in the future is entirely justified. Undoubtedly, there are other items of book-

keeping and accounting which may be cited that will offset partially the anticipated release of cash to income. For instance, there is in the 1947 consolidated income account an item designated as "Interest charged to construction, $328,383.65." This item is listed under income deductions, but in the statement it is in fact computed as a credit to income rather than a deduction. No one questions that it is a proper method of accounting, but of course it is not income. It is a proper adjustment as between expense items and construction items, and avoids any distortion in the operating statement. However, it must be conceded that it does tend to reflect bookkeeping income rather than dollar income.

Considerable emphasis is placed by the preferred stockholders upon the statement of the Commission that "the total amount of labor cost, including the pension costs, should not be materially affected by the nature of the pension plan adopted, for increased pension costs would no doubt be one of the factors taken into consideration in determining other labor costs." It is argued that the Commission assumed that the inauguration of the new pension plan would bring about a reduction in the demand by the unions for increased wages in the future. But, obviously, the Commission did not necessarily assume that labor costs would be lower because of the inauguration of the pension plan. The Commission, as well as Stone & Webster and the Company, reflected substantial increased labor costs in making a forecast of the earnings during the ensuing five-year period. But, on the other hand, one has a right to expect that better labor relations will be established as a result of a permanent pension plan for the employees, and to some degree, at least, it is reasonable to assume that better labor relations will be reflected by reason thereof in the collective bargaining which takes place between the Company and its unions. In view of many future conditions which may play an important part in increasing the Company's revenues, I cannot say that the entire proceeding should be sent back to the Commission for further study of the pension question. Not only did the Commission have this question before it from 1946 on,

disclosed by long and exhaustive testimony in the record, but its original opinion, as well as the supplemental findings and opinion issued January 30, 1948, unmistakably indicates that the Commission weighed the effect of the pension plan in making its forecast of future earnings. In its supplemental opinion of January 30, 1948, the Commission stated:

" * * * With respect to future labor costs, the preferred stockholders estimate that the annual cost of funding the company's present pension plan would approximate $1,000,000 after income taxes and asserts that, in addition to pension demands, the employees, of the Minnesota Company will seek cash wage increases, which local labor leaders are reported in a Minneapolis newspaper to have estimated will average 15¢ per hour.

"The estimate as to pension cost is in the same amount as that made by the company which we had before us and considered at the time of our previous opinion."

It seems fair to conclude that one must consider the proposed pension plan expense in light of all the evidence which undoubtedly will have a bearing upon the long-range earnings of the Company. And as the court stated in the Lahti case, 160 F.2d at page 851:

" * * * We are here in the realm not of mathematical demonstration, but of forecast, based upon expert analysis and weighting of a complex array of factors, in which the informed judgment of the Commission counts heavily. It could not be otherwise."

At the present time, the Minnesota Company is operating substantially to capacity. It has no appreciable reserve power. That does not mean that every day it is operating at peak capacity, but, at times when peak loads are required, there is no reserve stand-by generating capacity. This condition, and the demands for additional electric current from industrial, commercial and domestic users, have caused the Company to embark upon an extensive construction program involving some $123,-000,000. Some $22,000,000 will be required for reserve capacity plant. The Company estimates that the financial program contemplates the issuance of some $20,000,-

000 through the sale of new common stock, and although Stone & Webster in its estimate concluded that the construction program could be financed without the issuance of new common stock, the Commission found that some new common stock would have to be issued, but in an amount less than that assumed by the Company. The reason advanced by the Commission that new stock financing would be less than that assumed by the Company was due to its finding that some $12,500,000 in cash was, or would be, available in the Company's treasury for the financing of the contemplated construction costs. The Commission, however, set no figure as to the exact amount of common stock which would have to be issued. In any event, the preferred stockholders contend that the issuance of new common stock in a substantial amount will dilute the present common stock, and assert that the Commission made no calculations as to the effect of this dilution upon the earnings of the presently outstanding common stock. However, the Commission did state in its finding that, "In addition the issuance of the new common stock will effect a pro tanto dilution of the earnings applicable to the present Minnesota Company common stock." But, regardless of that observation, the preferred stockholders contend that no real consideration was given by the Commission to the problem of dilution, and they further point out that, when the Commission rendered its opinion, the contemplated construction program only involved some $96,000,000, but in 1948 the Company determined that the construction program would involve a figure of approximately $123,000,000. While some contention is made that, in making its estimate of $8,200,000 as average earnings, the Commission gave this figure as earnings without consideration to the new common stock to be issued in the future, it seems too clear for argument from a reading of the Commission's opinion that the $8,200,000 figure was its estimate of average earnings for the presently outstanding stock of the Minnesota Company. It seems fair to assume, therefore, as the Commission did, that some additional new common stock will be issued to enable the Company to finance its construction program. But, obviously, one cannot merely compute the effect of the issuance of $20,000,000 of new common stock on the earnings of the present outstanding stock upon the assumption that the earnings, when such new common stock is issued, will only be $8,200,000. The Company assumes that it will be required to issue $10,000,000 of new common stock in 1950 and the same amount in 1951. It palpably would be erroneous to presume that the expansion program will produce no additional net revenue, although the operating ratio will undoubtedly increase. Moreover, it is unthinkable that the Minnesota Company would launch upon a construction program of this magnitude without the assurance that the venture will increase the net revenues of the Company. The purpose of the construction program is twofold—to increase the reserve capacity for the present load and to increase the capacity in the generation and transmission of electric current for future needs. Granted that although the expenditure of some $22,000,000 for sufficient reserve capacity will not in and of itself produce revenue which can be earmarked as such, it must be recognized that the new construction for the purpose of reserve capacity for the present load will release older, insufficient generating units, which will become stand-by units, and the newer, efficient units will be placed on the production line. Undoubtedly, savings will thereby be effected. For instance, as an example of the relative efficiency of a new plant as compared with an old plant, the Company estimates 11,000 B.T. U. per kilowatt hour in a new plant as compared to 17,000 B.T.U. per kilowatt hour in the older plants. Reference also may be made to the new units to be constructed which will be equipped so as to burn either coal or gas. The use of natural gas, which is much cheaper than coal, will result in substantial economies in fuel costs. There is no justification for assuming that the operation of the Minnesota Company has reached its peak in producing net revenues. The construction program contemplates the addition of some 337,000 kilowatts of capacity from 1948 to 1951. This will result in approximately 60% addition to the Company's generating

capacity as of December 31, 1946. Nor is there any basis for assuming that the law of diminishing returns will apply to the Company's expansion program. This utility is not a static business; we are dealing with a rapidly growing company. That the Company itself is optimistic for the future is evident from its 1947 annual report. The operating revenues for 1946 and 1947 were $55,913,000 and $61,734,000, the highest in the Company's history. The following statement with respect to increased revenues appears in the report:

"These increased revenues were the result of real growth in business, derived from a large increase in the number of residential and rural customers, some large industrial development and much small business expansion."

Later in the report this appears:

"The housing shortage is still a problem in this territory and the new residential building which will be necessary to overcome it constitutes a substantial backlog for future business."

And anent the construction program, the following statement is made:

" * * * The construction program which is now under way is designed to meet these conditions and to provide for future increases in business."

It may not be amiss to take judicial notice of a full-page advertisement that appeared in one of the local newspapers under date of August 8, 1948, wherein the Northern States Power Company had this to say regarding its program to spend some $125,000,000 in new construction during the next five years:

"The Upper Midwest is growing. Population is increasing. Business and industries are increasing. Hand in hand with this growth in population and business, Northern States Power Company has experienced a tremendous increase in the demand for electric power. Within the next five years our Company expects the demand for electricity will increase 50%.

"Business, industry, as well as homes and farms, cannot function unless there is an adequate and dependable supply of electric power. If, as we expect, the demand for electricity increases 50% in this period,

the Northern States Power Company must be ready to meet this demand if we are to properly serve the public. This entails long-range planning and a tremendous amount of building."

Then follows an outline of the various units which are to be constructed throughout the States of Minnesota, Wisconsin, South and North Dakota. While an advertisement such as this ordinarily may not constitute the most reliable form of evidence, at least it indicates that the Company appears optimistic as to the future increase in revenues which will be forthcoming when the construction program is completed. If the demand for electricity during the next five years increases 50%, there cannot be much question but that net revenues will increase. With the increased demands for electricity, there is no way of determining, of course, the rates which will prevail. About 77% of the Company's operations are in the States of Minnesota and South Dakota, where there are no regulatory Commissions to regulate rates. The Minnesota Company has followed the policy of voluntary rate reductions from time to time. Its rates are substantially below the national average. But whether the rates are voluntary or regulated by a Commission in the future, there is no reason to assume that the contemplated expansion will not afford increased net revenues.

The preferred stockholders contend that the Stone & Webster report is a partisan report, influenced by the fact that this concern was employed by the common stockholder groups; that it presents an overly optimistic picture of the future of the Minnesota Company in that no consideration was given in its forecast for the next five years to a possible depression; and that the forecast was motivated by a desire to increase the equity of the Delaware common stockholders in the Minnesota common stock which is to be allocated and does not present an unbiased analysis of the Company's past and future business. That the Stone & Webster report may be characterized as a so-called partisan report may be conceded. Presumably, utility analysts, as well as lawyers, endeavor to present their clients' interests to the best advantage. But it does not follow that the Commis-

sion did not give due weight to any partisan aspects that may appear in the analysis made by this company. And it must be recognized that the Stone & Webster forecasts of revenues for the years 1946 and 1947 were not too optimistic; generally, their forecasts have been more accurate than those made by the Company. The earnings estimated by Stone & Webster for 1947 were $8,011,000, when the actual figure was approximately $8,616,000. The Company's estimate for 1947 was $7,190,000, and its estimate for 1946 was about $6,900,000, which is about two million dollars less than the actual net earnings for that year. Criticism is also directed to the Stone & Webster report in so far as it pertains to the method of estimating residential electric revenue. Granted that it seems apparent that a basic error was committed in its computation of the rate per kilowatt hour in residential revenues, it does not follow that all of its computations are unreliable, and, regardless of the apparent error upon which the preferred stockholders rely, and although the claimed error is not cured thereby, the 1947 actual residential revenues were approximately the same as the Stone & Webster estimate for that year. It is true that Stone & Webster assumed that no major depression would occur during the ensuing five-year period, but it did consider that a "recession" might occur during those years. But its failure to assume a "major depression" does not destroy the reliability of its analysis of future company earnings. Even learned economists do not agree as to when the next depression will occur. Some have contended it would blight our economy long before this; others are more optimistic. Indeed, I have no way of determining the soundness of Stone & Webster's assumption in this regard.

■ With great earnestness, the preferred stockholders contend that the Company's estimate of average earnings for the five-year period from 1947 to 1951, inclusive, is more reliable than that made by Stone & Webster. They point out that the officials of the Company, with their close contact with the business conditions and problems in the area served by the Company, are bound to be better equipped to form estimates and forecasts for the future than Stone & Webster in its comparatively brief field study and analysis. There is every reason to believe that the officials of the Company have given their very careful consideration to the problem of making an accurate forecast for the future. But, on the other hand, it is only natural that, unwittingly perhaps, they should lean to a conservative and cautious picture of future earnings. They undoubtedly recognize that there are too many uncertainties to do otherwise. And generally no one can find fault if the officials of a company underestimate earnings, but quite the contrary if they are unduly optimistic and the earnings fall off. But, taking the Company's own "judgment" figures, it will be seen that they do tend to sustain the Commission's estimate of $8,200,000 of average earnings. If we take the actual earnings for 1947 of $8,616,000 and the 1948 to 1951 assumed figures of the Company, we find that, upon those assumptions, there will be annual average earnings for those five years of a sum closely approximating $8,200,000, and while in making its forecast the Company merely expressed so-called judgment figures based upon assumptions which have heretofore been outlined, there is no showing that these assumptions are in any way unreasonable or that they will not materialize over the five-year period. Consequently, it would seem that, in light of the Company's own judgment figures and the estimates of Stone & Webster, there was a substantial basis for the Commission's finding that the average net earnings available for the presently outstanding common stock would be $8,200,000.

The historical earnings of the Company for the past twenty years are cited by the preferred stockholders as the only safe guide for the future. These earnings undoubtedly reflect the depression period, wartime earnings, the impact of the excess profits tax, and many other conditions which over the period of years have had a direct effect upon the net revenues of the Company. Indeed, one must recognize that we are now going through a period of unprecedented prosperity in the area served by this utility and its subsidiaries. Agricultural earnings have never been higher

and unemployment is practically nil. Rainfall has been overly abundant, and there has been an unusual demand for electric current from residential, commercial and industrial users. One cannot assume that this condition will continue. There is bound to be a recession, and in future years one must look for the recurring cycle of deficient water for the hydro plants and adverse economic conditions which will affect the earnings of the Company. But, on the other hand, in determining the weight to be given to past earnings, we cannot overlook the fact that the Company of today, and especially of tomorrow, cannot be compared with the Company which existed twenty years ago, or even ten years ago. During the eight years preceding 1946, the Company spent $80,000,000 for new plants and there is now under way an expansion program involving a sum substantially in excess of that figure. If the operations of the Company had remained static over the past ten years, past earnings would undoubtedly be a guide for future revenues. But this Company has evolved from a utility producing less than 200,000 kilowatts in 1926 to one which will produce an estimated 750,-000 kilowatts in 1951. There is every reason to believe, therefore, that the earnings of the Company and the resulting net revenue available for the common stockholders will be substantially in excess of the average historical earnings for the past ten or twenty years, and there is no doubt but that a public utility company selling electric current is not subject to the same economic contingencies which confront the ordinary manufacturing concern, for instance. There is bound to be a continual demand for electric current in periods of economic recession. The need and demand for electric current, electric appliances, and electric power do not disappear during periods of economic adversity. In passing, it may be noted that revenue from residential users is apparently the mainstay of the Company's business. The use of electricity for home use remains reasonably constant regardless of temporary economic adversity.

In support of their position that the Commission has been unduly influenced by war-peak earnings which the preferred stockholders assert have been in existence since 1945 when the excess profits tax was removed, they strongly urge the probability of another excess profits tax being legislated by Congress in view of the national and international situation which now confronts this country. This argument was urged upon the Commission after the issuance of its findings and opinion in December, 1947, and in its supplemental findings and opinion of January, 1948, this argument was considered by the Commission: It stated anent the possibility of increase in corporate taxes:

" * * * The prospect that there may in the immediate future be some increase in such taxes does not alter our opinion previously expressed that in the long run a reduction in the level of corporate taxes is likely."

What the corporate taxes may be in the future in so far as their impact upon the earnings of the Minnesota Company is concerned, obviously cannot be foretold with any degree of certainty. And if they are increased, how long will they remain in effect? What will be the tax basis if excess profits taxes are levied, in view of the recent earnings of the Company and its capital expenditures? The relationship between any increased taxes in the future and voluntary rate reductions which the Company has inaugurated from time to time? These queries and many more reflect the difficulties encountered when one assumes to evaluate the effect of a change in the tax situation. The Commission concluded that, over the years, reduction in the level of corporate taxes will probably take place. There may be room for disagreement with that assertion. Generally, it has been our experience that taxes in the long run increase rather than decrease. If the European situation becomes more complex, or if there should be another war, no one can estimate the load that America may be required to bear and consequently the increased revenues that may be necessary to support the many programs, national and international, upon which the Government will be launched. But whatever the tax position of the future may be, the Court would not be warranted in refusing to sustain this plan upon the assumption that the Commis-

sion has erred in predicting that, over the years, taxes would be reduced. In making that statement, the Commission does not negate the fact that there may be another excess profits tax, but apparently it is of the opinion that it would not be a permanent matter and that, as one envisages the future, there will be a tax reduction rather than a tax increase over the long run. The Commission may be right, or it may be wrong. But I am reasonably clear that the question of the future tax situation is not a matter that should be referred back to the Commission. It has exhaustively considered this question and the record will not justify a finding that it has erred in that regard.

The preferred stockholders contend that there must be available to them at least $6,300,000 of common stock earnings in order to compensate them for the bundle of rights which they will be required to surrender. This includes their right to $5,-084,133 of annual cash dividends, and the balance by way of interest on dividend arrearages, liquidation preference and loss of position. Therefore, it is reasoned that, on the basis of earnings of $7,200,000 per year, which was the Company's estimate as the basis for its second amended plan before it was modified, and which the preferred stockholders contend is the maximum net income which will be available for common stock dividends in the future, they should be allocated 87.5% of $7,200,000, instead of 78% as the Commission's plan provides, or approximately $6,300,000. On the assumed earnings of $8,200,000, the Commission made available some 78% of such earnings, or $6,400,000 for the preferred stockholders, and upon the assumption that 80 to 85% of $6,400,000 will be declared as dividends, there will be from $5,120,000 to $5,420,000 available for the preferred as dividends. The assumption, however, that 80 to 85% of the net earnings will be paid in dividends on the common stock of the Minnesota Company is questioned by the preferred stockholders, and they offered proof that, according to statistics of the Federal Power Commission, the percentage of earnings paid out on all electric common stocks for the years 1946 and 1947 were 66.9%. But

if the policy of paying that percentage in dividends were followed by the Minnesota Company in the future, there would be paid in dividends to the preferred on the basis of an allocation of $6,300,000 earnings, which the preferred concede would be sufficient, some $4,214,000, a sum substantially less than the minimum of $5,084,000 which the preferred are entitled to receive by way of cash dividends. It may be doubted that the average dividend payments of other companies are particularly helpful. Some pay out nearly 100% in dividends; others pay out a very small portion of their earnings. The Commission made it clear that it used the 80 to 85% rate for illustrative purposes only, and recognized that, during the construction program period, for instance, the percentage may be lower, while during other periods it may be higher. The past experience of the Minnesota Company in the payment of dividends on its common stock reflects a higher percentage than that used by the Commission. The percentage of the average dividends paid on Minnesota common from 1938 to 1945 was 86.1%, and the average going back to 1927, a fifteen-year period, was over 90%. Admittedly, the percentage paid out by way of dividends in the past may not furnish a safe criterion in forecasting future policy in this regard. No doubt the cumulative right of Delaware preferred to dividends at 7% and 6% would seem to require a higher percentage by way of dividend pay-outs than would obtain where common stock dividends are not the basis for the payment of dividends on preferred stock in a parent company. However, in the reorganization, the present Delaware preferred will have voting control of the common stock of the Minnesota Company. It will be in a position to elect directors who will determine the dividend policy, and while the percentage of earnings plowed back into the Company and not paid out as dividends may not be as valuable to the stockholder as cash dividends, such earnings left with the Company undoubtedly do increase the quality of the stock and the more earnings left with the Company the less new common stock will have to be sold for the financing of the construction program. It must be assumed that the Com-

pany will follow a dividend policy which will be for the best interests of the stockholders.

In forecasting, as the Commission did, that over a long range of years there will be available as dividends for the preferred stockholders an annual average of $6,400,000, it is not necessary to make any exact computation as to the respective amounts allowed by way of compensation for dividend arrearages, liquidation rights, or loss of preferred position. I am inclined to agree with the view of the Commission that allowance of interest on dividend arrearages for perpetuity, as computed by the preferred stockholders, seems highly excessive and unwarranted, but that substantial compensation should be accorded for unpaid dividend arrearages is clear. The Commission considered the feasibility of increased cash payments on dividend arrearages of the preferred, as suggested by some of the Delaware common stockholders, but in view of the necessity of conserving cash and for other reasons, that plan was not followed. The present current assets of the Delaware Company are to be used to make the contemplated cash payment on the preferred's dividend arrearages. However, the fact that the preferred now control 69% of the voting power of Delaware will not justify a finding that that class of stock could liquidate the Company and hence greater weight should be accorded to the call premium which the charter provides upon its dissolution. The voting rights which the preferred stockholders now have were given to them by the Commission in 1938 as a preliminary step in this very reorganization, and while it appears that the Commission did accord some consideration to the preferred premium rights on the call of that stock, it is now definitely settled in Otis & Co. v. Securities and Exchange Commission, 323 U.S. 624, 65 S.Ct. 483, 89 L.Ed. 511, that in a reorganization of this nature, the rights of the preferred are not measured as though they were matured, but rather in light of a going concern.

Some reference has been made to the future restrictions upon the payment of dividends by the Delaware Company because of impairment of its capital due to the fact that, as of December 31, 1946, it was carrying the Minnesota stock at an amount of some $32,000,000 in excess of the underlying book value of that stock. This was occasioned by the requirement that the Minnesota Company write off some $23,000,000 (plant acquisition adjustment 100.5 account) and $8,750,000 (plant adjustment 107 account). If the Delaware Company were to continue in existence, this excess in carrying value would have to be disposed of by some recognized appropriate accounting practice. If it were amortized over a period of years, neither common nor preferred would obtain any dividends. The Commission gave due consideration to this situation and its effect upon the rights of the parties to this proceeding. It recognized that, while there would be no dividends to either the common or the preferred, the preferred would be improved in quality by reason of the cash retained.

Upon the basis of the allocation by the Commission of $6,400,000 of foreseeable earnings for the preferred and if dividends are to be paid to the extent of 85%, there would be annual dividends available to each shareholder of the 7% preferred of about $7.30 and to each shareholder of the 6% preferred about $6.60. Without, therefore, attempting to assume to measure with any exactness the money value of every element of the bundle of rights surrendered by the preferred, it is not seriously questioned that, if the computation of $6,400,000 of foreseeable annual earnings for the preferred is sustained in this record, that class of stock will receive the equitable equivalent of that which they will be required to surrender. As the Commission points out, $6,400,000 of earnings capitalized at 7.7% (12.97 times earnings) has a value equal to the liquidation preference of the Delaware preferred stock, including dividend arrearages not paid in cash under the plan, and capitalized at 7.12 (14.04 times earnings) has a value equal to the redemption price of the preferred stock including the arrearages not paid in cash.

There are numerous other matters in the record which were discussed by counsel in their presentation to the Court and as to which the Commission made detailed reference, such as the effect of increases in

the price of coal, wage increases, the rate of return which a public utility such as the Northern States Power Company would be permitted to obtain, the probability of voluntary rate reductions by the Company in the future, the effect of drouth periods on expense of generating current, the effect of refinancings, and many others. All of these questions have been exhaustively considered by the Commission, as well as many corporate accounting problems which are not considered at any length in this opinion. The Commission and the Company, as well as Stone & Webster, recognized that there would probably be increases in the price of coal and in wages, and due consideration was given to the impact of these factors upon future earnings. It may be noted, however, that as to some industrial users the price of electric current is contingent upon coal prices and there are escalator clauses in the contracts with these users which provide that the price of electric current is increased or decreased to the consumer in the proportion as the price of coal increases or decreases to the utility company. Considerable emphasis is directed to the Commission's finding in 1945 that the foreseeable earnings available for the common were only some $6,500,000 and that the Commission reversed itself in 1946 and now comes forward with what the preferred stockholders characterize as an excessive estimate of $8,200,000. It is argued, as heretofore stated, that the Commission is being unduly influenced by the peak earnings of 1946 and 1947, and that the fact that the Commission has reversed itself in a relatively short period as to future earnings tends to indicate the unsoundness of its present forecast. The Commission frankly concedes that it was in error in its 1945 estimate, but at that time it did not have the benefit of the Stone & Webster report, nor the record of the 1946 earnings. It also points out that many changes have taken place since that time which justify its reversal, and that the officials of the Company, who are supposed to have been better informed in this regard, were also in error in their forecasts and that both the Company and the Commission erroneously assumed that there would be a recession immediately after the war.

■ Concededly, the problem of a fair and equitable allocation of the Minnesota common stock as between the Delaware preferred and common stockholders is a most difficult one, and although I am of the opinion that the Commission's plan should be sustained, I recognize that many of the questions posed by the preferred stockholders are not free from doubt. Plausible arguments can be made in their behalf which may give rise to some doubt as to whether they will be accorded the equitable equivalent of that which they are required to surrender and I am impressed with the argument that one should take every precaution in estimating earnings and making an allocation of the common stock so as to insure full and complete compensation to the holders of preferred stock, which has certain definite preferred rights as compared with a security which has not had any dividends since 1934 and which is not entitled to dividends until the preferred arrearages are paid in full. But no doubt arguments just as plausible could be made by the common stockholders if the forecast of earnings was reduced to $7,200,000, and if the percentage of allocation was the Company's proposal of 83.28% and 16.72%. If the first plan had become effective in 1946 as urged by the preferred stockholders, there would have been available to them 90.44% of the net earnings of $8,885,000, or in excess of $8,000,000, and on the basis of the Company's second amended plan, there would have been available to them about 83% of the net earnings of that year, or an excess of $7,000,000. Certainly, upon the basis of those earnings, the percentage allowed by the first two plans would have resulted in a windfall for the preferred stockholders.

In conclusion, it should be emphasized that the proposed allocation made by the Commission is based upon long-range considerations. It is not merely for a five-year period, but it will be in perpetuity. During some years the return for the preferred may be less than that to which they are entitled. In other years their return may exceed their equitable equivalents. At best, the allocation is merely the exer-

cise of one's sound judgment on the full and complete record which has been made before the Commission, and obviously we have no yardstick to determine with any mathematical certainty that that which the preferred stockholders will ultimately receive over a long period of years will be full and complete compensation for the rights which they are required to give up. It is urged that the forecast for a five-year period, as made by Stone & Webster, and the judgment figure for that period by the Company, is too short and that it does not cover a period which would include the many economic cycles of depressions and recessions. Granted that a five-year forecast is too short, but how can one take a longer period of ten or twenty years without indulging in the sheerest kind of conjecture? Apparently, there is no alternative plan which is more feasible than the one which contemplates the allocation of the Minnesota common stock to the Delaware stockholders. That such a plan is fraught with many contingencies which will always afford the contending parties plausible ground for demonstrating the unfairness to their particular class seems apparent, and while I do not believe that the position of the preferred stockholders in objecting to the allocation proposed is without substance, I am quite clear that I would not be justified on this record to substitute my judgment for that of the Commission when factual questions alone are involved and in a field where it concededly is better equipped to analyze and appraise the many complex problems presented. Giving due weight, therefore, to the factual findings of the Commission, I am of the opinion that the plan should be approved.

There was presented to the Court evidence as to the probability of future excess profits taxes, the fact that the Company's estimate for construction costs was increased from $96,000,000 to $123,000,000, the decline in the market price of utility stocks from the time the Commission closed its records, the increased operating ratio of the Company as reflected in the 1947 annual report, and other items, upon the theory that the record before the Commission was stale. However, I am clear

that the changes which have taken place since the Commission's consideration are only normal changes, and none of the proffered evidence constitutes changes of such a material character so as to render the Commission's plan untenable.

Therefore, I approve the plan as fair and equitable and as appropriate to effectuate the provisions of Section 11 of the Public Utility Holding Company Act of 1935.

Findings of fact and conclusions of law and a proposed form of decree may be submitted.